Ferris ALEXANDER, Appellant,

v.

Richard THORNBURGH, in his official capacity only as Attorney General of the United States, Appellee.

UNITED STATES of America, Appellee,

v.

Ferris Jacob ALEXANDER, Sr., a/k/a Pete Saba, Peter Saba, Paul Saba, John Thomas, Bob Olson, Jim Nelson, Jim Peterson, James Peterson, Robert Carlson, Frank Netti, Appellant.

Nos. 89–5364, 90–5417.

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1991.

Decided Aug. 30, 1991.

Rehearing and Rehearing En Banc Denied Oct. 30, 1991.

Michael Mayock, Pasadena, Cal., for appellant.

Paul A. Murphy, Minneapolis, Minn., for appellee.

Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Following a four-month trial, a jury convicted Ferris J. Alexander, Sr., on 24 counts[1] of a 41–count indictment. The

1. A jury convicted Alexander on one count of conspiracy to defraud the United States by impeding the lawful functions of the Internal Revenue Service in violation of 18 U.S.C. § 371 (1988); two counts of filing false income tax returns in violation of 26 U.S.C. § 7206(1) (1988); three counts of violating 18 U.S.C. § 1962 (1988) (RICO), including conspiracy to engage in or conduct an enterprise through a pattern of racketeering activity, receipt and use of income derived from a pattern of racketeering activity, and engaging in the conduct of an enterprise through a pattern of racketeering activity; twelve counts of knowingly transporting

counts included conspiracy to defraud the IRS, the sale of obscene magazines and videos, tax evasion, and RICO violations. Alexander appeals from his convictions and the application of the forfeiture provisions of 18 U.S.C. § 1963 (1988). Alexander argues that his conviction of engaging in a conspiracy to defraud the IRS should be reversed because: (1) the indictment alleged and the evidence showed, if anything, multiple conspiracies and not one conspiracy; and (2) the count was defective because it charged a general conspiracy rather than a conspiracy to violate a specific statute. He also argues that his convictions for transporting obscene materials must be reversed because the jury's verdicts are inconsistent. He also attacks the district court's[2] application of the forfeiture provisions of RICO, arguing that the application of RICO: (1) unconstitutionally criminalized non-obscene expressive material; and (2) violated the first and eighth amendments to the United States Constitution. He further argues that the obscenity standards set forth in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), violate his due process and first amendment rights. He also claims that the evidence was insufficient to support his convictions of filing a false income tax return, violating RICO, using a false social security number, and on all other counts. Finally, in a separate appeal, he appeals from the district court's[3] entry of summary judgment in his civil suit filed against the government arguing that the use of obscenity as a predicate to RICO violated his first amendment rights. We affirm the convictions, and the orders of summary judgment and forfeiture.

The evidence presented at the four-month trial was far-reaching and spanned a thirty year period. Only a brief outline of that evidence is necessary for our purposes, and we will provide further details as required in analyzing the issues on appeal.

Alexander was in the adult entertainment business for more than 30 years selling magazines, showing movies, and eventually selling and leasing video cassettes. The evidence at trial established that Alexander set up sham corporations and operated many of his businesses using false names and names of employees.

For example, evidence showed that from 1959 to 1976, Alexander used the name of an employee, Kenneth LaLonde, to conduct his businesses under the name of Kenneth LaLonde Enterprises. In 1969, Alexander hired an attorney, Robert J. Milavetz, who incorporated several corporations under the name of Kenneth LaLonde Enterprises. Alexander obtained licenses required for these businesses and opened bank accounts under LaLonde's name. Reports were also sent to the State of Minnesota under the name of Kenneth LaLonde Enterprises. The businesses were reported on LaLonde's individual tax return, and no corporate tax returns were filed.

Eventually, Milavetz had a falling out with Alexander and Alexander began using other attorneys, including Randall Tigue. In 1976, Tigue witnessed LaLonde's signature as the incorporator of two more corporations. Alexander consolidated the operation of his theaters and bookstores under these corporations, and on May 1, 1977, the name of LeRoy Wendling was substituted as the front name used to conduct Alexander's businesses. Alexander opened bank accounts for these corporations under the name of Wendling, another Alexander employee. These corporations were also reported to state and federal agencies showing Wendling as the owner. Corporate tax

obscene material in interstate commerce for the purpose of sale or distribution in violation of 18 U.S.C. § 1465 (1988); five counts of engaging in the business of selling or transferring obscene material in violation of 18 U.S.C. § 1466 (1988); and one count of falsely misrepresenting a social security number for the purpose of impeding the IRS in violation of 42 U.S.C. § 408(g)(2) (1988) (now codified at 42 U.S.C.A. § 408(a)(7)(B) (West Supp.1991)).

**2.** The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota.

**3.** The Honorable David S. Doty, United States District Judge for the District of Minnesota.

returns were filed and signed with a signature stamp of Wendling's name.

Wendling filed his personal tax returns listing Alexander's income. This arrangement continued until the end of 1980, when Wendling was fired, and the name "John Thomas" was substituted on some of these records and placed on the Wendling bank account. Alexander admitted that the name "John Thomas" was "the name [he] used."

On December 27, 1984, In Sok Na, another Alexander employee, executed, as incorporator and first director, the articles of incorporation for ten different corporations. In Sok Na was a Korean immigrant and spoke little English. Alexander testified that he formed these corporations to avoid potential civil liability. The names of six of the corporations were in Finnish and four were in a dialect of the Philippines.[4] None of these corporations filed tax returns. Two of the corporations were used to buy real estate and a bookstore.

In addition to using the names of LaLonde, Wendling, and Na, Alexander used a number of other names in operating bank accounts, obtaining licenses, and complying with various state and federal reporting regulations.

The government's evidence showed several examples of the lengths to which Alexander went to conceal his identity as the owner and operator of his various businesses. During the time Alexander ran his businesses under the name of LaLonde Enterprises, Alexander sent Milavetz to unemployment compensation hearings and instructed Milavetz to appear on behalf of Kenneth LaLonde or Kenneth LaLonde Enterprises. In one instance, LaLonde signed a license application for one of the theatres known as the "Flick." LaLonde appeared before the St. Paul City Council in the licensing application proceedings acting as the "owner" of the business. After the City Council balked at granting the license, Tigue advised the Council that he represented Alexander and LaLonde and a lease existed between the two. Subsequently,

Tigue filed a lawsuit in the United States District Court against the City of St. Paul and its council members on behalf of Alexander and LaLonde stating that a lease existed between LaLonde and Alexander. The city council subsequently granted the license in LaLonde's name. LaLonde testified that he became aware of the lawsuit by reading about it in the newspaper, that he never had a lease on the business, and that his signature verifying the complaint, notarized by Tigue, was a forgery. In later years, licenses were issued in LaLonde's name without his knowledge, but with the participation of Tigue, and continued after LaLonde left Alexander's employ.

The revenues generated from Alexander's retail and rental stores were brought to him at the central warehouse and main office where the cash was commingled and taken to various banks. Alexander deposited some of the cash in various accounts and converted the rest into large denomination bills, cashier checks, and money orders. The cashier checks and money orders were payable to various individuals and entities. All expenses were paid out of Alexander's primary bank accounts, and all merchandise was shipped from California to his warehouse, where it was wrapped, priced, and boxed for distribution to Alexander's retail outlets. Because of disorganized and incomplete records, the government had a difficult time attempting to calculate Alexander's income. Nevertheless, the government estimated that Alexander underreported his 1982 gross receipts by $1,322,135 and $1,416,883 in 1983.

Alexander testified about many of these details. He confirmed that he used LaLonde, Wendling, and other individuals' names in the operation of his businesses, and that revenues from the businesses were reported on LaLonde's and Wendling's personal tax returns. He admitted that he purchased properties and submitted reports to state and federal agencies in other people's names. He attributed many of these decisions to Tigue and stated that he had no knowledge of some of the vari-

---

**4.** The translation of these corporate names was profane, and the district court excluded the translation as having more prejudicial value than probative value.

ous businesses. Alexander also admitted that he signed a form on a Paine Webber investment account using a social security number that was not his social security number.

The jury found four magazines and three videos to be obscene, and these findings were the basis for convicting Alexander of transporting obscene material for the purpose of sale, selling obscene materials, and the RICO counts.

After the return of guilty verdicts, the district court reconvened the same jury to hear a portion of the forfeiture proceeding under 18 U.S.C. § 1963(a)(2). The jury heard additional evidence, including Alexander's testimony regarding the forfeitability of his interest in the enterprise and the property that afforded him a source of influence over the enterprise. Thereafter, the district court reconvened without a jury for a further evidentiary hearing as to forfeiture of any interest Alexander had acquired or maintained in violation of section 1962 and of any property constituting proceeds obtained directly or indirectly from racketeering activity. The government offered additional evidence of 30 magazines and 16 videos purchased or seized by the FBI during its criminal investigation, and an additional 418 videos and 9 magazines were admitted through the testimony of witnesses who had appeared as representatives of Alexander's wholesale sources.

The court sentenced Alexander to terms of imprisonment ranging from 36 to 72 months, all terms to run concurrently. *United States v. Alexander*, No. 4-89-85(1), Order and Judgment of Sentencing, slip op. at 3 (D.Minn. Aug. 13, 1990). In addition, the court imposed a fine of $100,-000 and a special assessment of $950, and ordered Alexander to pay the costs of his incarceration ($1,415.56 per month), his supervised release ($96.66 per month), and the costs of prosecution ($29,737,84) *Id.* at 6–7. Finally, pursuant to 18 U.S.C. § 1963(a)(2), the court ordered forfeiture of Alexander's interest in ten of fourteen

pieces of commercial real estate in which the jury found beyond a reasonable doubt Alexander had an interest or which afforded Alexander a source of influence over the racketeering enterprise and which the court concluded were acquired, maintained, or derived from proceeds of the racketeering activity.[5] *Id.* at 7 (incorporating Order and Judgment of Forfeiture (Aug. 6, 1990)). Alexander forfeited his interest in his wholesale business and thirteen retail businesses (bookstores and video stores) that were used in the criminal enterprise, and $8,910,548.10 in monies acquired, maintained, or constituting proceeds obtained from the racketeering activity in the years 1985 through 1988. *United States v. Alexander*, No. 4-89-85, Order and Judgment of Forfeiture, slip op. at 6, 11, 1990 WL 117882 (D.Minn. Aug. 6, 1990). Alexander also forfeited his interest in business assets and personal property. *Id.* at 6–11. This appeal followed.

### I.

Alexander appeals the jury's verdict on the conspiracy count (Count I) arguing that the count is defective in two ways. The indictment alleged that over the course of twenty years, Alexander engaged in a conspiracy to defraud the United States by defeating the lawful functions of the IRS. This has become known as a *Klein* conspiracy, taking its name from *United States v. Klein*, 124 F.Supp. 476 (S.D.N.Y.1954), aff'd, 247 F.2d 908 (2d Cir.1957), *cert., denied*, 355 U.S. 924, 78 S.Ct. 365, 2 L.Ed.2d 354 (1958).

Alexander contends that the district court must reverse his conviction on Count I because the indictment alleged a single overall conspiracy and the proof at trial showed not a single conspiracy, but a series of separate conspiracies. *Kotteakos v. United States*, 328 U.S. 750, 773–74, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946). Alexander argues that there was not just one conspiracy for twenty years, pointing out that at the time the alleged conspiracy

---

**5.** Titles to the other four pieces of real estate Alexander used for his magazine and video businesses were held in the name of Dolores Alexan-der and were not forfeited to the United States as a result of the jury's forfeiture verdict.

started some key members were in high school. He further argues that he had dismissed many of the members of the alleged conspiracy and that they had no knowledge of later transactions. He asserts that looking at the totality of the circumstances, this case is a "series of scenes of a life of hustling" and not one conspiracy.

■ Whether a conspiracy is one scheme or several is primarily a jury question. *United States v. Wilson,* 497 F.2d 602, 604 (8th Cir.), *cert. denied,* 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 664 (1974). As this court has stated:

> The general test is whether there was "one overall agreement" to perform various functions to achieve the objectives of the conspiracy.... A conspirator need not know all of the other conspirators or be aware of all the details of the conspiracy, so long as the evidence is sufficient to show knowing contribution to the furtherance of the conspiracy.

*United States v. Massa,* 740 F.2d 629, 636 (8th Cir.1984) (quoting *United States v. Zemek,* 634 F.2d 1159, 1167 (9th Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981)), *cert. denied,* 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985) (other citations omitted).

We have also stated that "[t]he existence of a single agreement can be inferred if the evidence revealed that the alleged participants shared 'a common aim or purpose' and 'mutual dependence and assistance' existed." *United States v. DeLuna,* 763 F.2d 897, 918 (8th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985) (citations omitted).

■ We are satisfied that the evidence supported a jury finding of a single *Klein* conspiracy, spanning many years and involving numerous individuals with the common goal of impairing and impeding the IRS in determining the nature and extent of Alexander's businesses. We therefore reject Alexander's argument that Count I was defective because it failed to allege multiple conspiracies.

■ Second, Alexander argues that Count I of the indictment is defective because it should have charged him with a conspiracy to commit a specific crime under 26 U.S.C. § 7206(1) (1988), rather than a conspiracy to defraud under 18 U.S.C. § 371. Alexander relies on *United States v. Minarik,* 875 F.2d 1186 (6th Cir.1989), and *United States v. Mohney,* 723 F.Supp. 1197 (E.D.Mich.1989).

In *Minarik,* the defendants were charged with willfully conspiring to defraud the United States by impeding, impairing, obstructing, and defeating the lawful functions of the Department of the Treasury in violation of 18 U.S.C. § 371. 875 F.2d at 1188. The government did not allege a conspiracy to commit an offense against the United States—another provision of 18 U.S.C. § 371, despite the fact that its evidence at trial and the bill of particulars alleged that the conspiracy was one to violate 26 U.S.C. § 7206(4) (concealment of assets with intent to evade or defeat assessment of tax). *Id.* at 1188–89. The Sixth Circuit stated that when Congress has enacted a specific statute addressing a given problem, thus creating a specific offense, "[t]he court should require that any conspiracy prosecution charging that conduct be brought under the offense clause" of 18 U.S.C. § 371, rather than under the defraud clause of that statute. *Id.* at 1193. In *Mohney,* a Michigan district court dismissed the first count in an indictment alleging conspiracy to defraud the government because the government's accusation in the count was essentially a charge that defendants conspired to violate 26 U.S.C. § 7206, and therefore, under *Minarik* the conspiracy had to be charged under the offense clause of the conspiracy statute. 723 F.Supp. at 1203.

*Minarik* is quite limited, however, to its facts. As that court explained:

> [t]he "offense" and "defraud" clauses as applied to the facts of this case are mutually exclusive, and the facts proved constitute only a conspiracy under the offense clause to violate 26 U.S.C. § 7206(4)....

875 F.2d at 1187.

In *Minarik,* the defendants engaged in a narrow course of conduct directed at one

object—to sell a house and get the money in an untraceable manner. This obviously is not the circumstance in this case in which Alexander's conduct is long-spanning, far-reaching, and involves many activities and events. Moreover, Alexander does not even argue that he lacked adequate notice of the charge he had to defend, and at least one court has held that this is the only holding of *Minarik*. *United States v. Reynolds*, 919 F.2d 435, 438–39 (7th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1402, 113 L.Ed.2d 457 (1991); *see also United States v. Bilzerian*, 926 F.2d 1285, 1301 (2d Cir.1991), *pet'n for cert. filed,* No. 90–1803 (May 22, 1991). We do not believe that *Mohney* is applicable or persuasive. We reject Alexander's argument that Count I was defective because it alleged a violation of 18 U.S.C. § 371.

## II.

■ Alexander next argues his convictions for transporting and selling obscene materials must be vacated because the jury's verdicts are inconsistent, and the inconsistency mandates a conclusion that there was insufficient evidence to support these convictions. Alexander contends that the jury verdicts are inconsistent because the jury found some items obscene in one count and not obscene in other counts. Specifically, Alexander points out that the jury returned a verdict of not guilty on some of the counts involving the magazine *The Fat Book*, and guilty verdicts as to other counts involving the same magazine. He also says a verdict inconsistency is shown by comparing the jury's guilty verdict on Count XXXIX involving the magazines "Sweet" and *"Party,"*[6] and not guilty verdicts on all counts involving the

single sale of the magazine *"Sweet."* (Counts XXVI, XXVII and XL).

Alexander's argument is spurious. The court instructed the jury that when a count alleges two different videotapes or magazines to be obscene, they must find only *one* of them to be obscene in order to return a guilty verdict.[7] The verdicts therefore are not inconsistent.

Alexander further argues that the jury did not apply contemporary community standards, but instead made impermissible distinctions based on values of taste, morality, and cultural rejection, resulting in inconsistent or compromise verdicts. Alexander's argument asks us to speculate on how the jury reached its verdicts, which we may not do. The district court defined obscenity in accordance with the definition of obscenity announced in *Miller v. California*, 413 U.S. 15, 24–25, 93 S.Ct. 2607, 2614–2615, 37 L.Ed.2d 419 (1973). Under its instructions, the question of obscenity is one of fact to be determined by the jury, and we cannot conclude that the jury's verdicts are inconsistent or the result of compromise. Moreover, this court has explained " 'inconsistency of a verdict on separate counts of an indictment does not entitle a convicted defendant to reversal of a judgment of conviction.' " *United States v. Martin*, 933 F.2d 609, 612 (8th Cir.1991) (quoting *United States v. Bryant*, 766 F.2d 370, 376 (8th Cir.1985), *cert. denied,* 474 U.S. 1054, 106 S.Ct. 790, 88 L.Ed.2d 768 (1986)). We reject Alexander's argument that his convictions for transporting and selling obscene materials should be reversed because the verdicts are inconsistent or the result of compromise.

## III.

■ Alexander also argues in both his civil and criminal appeals[8] that the legal

---

**6.** The jury found some of these materials obscene, and their titles insofar as they are not descriptive of the contents, serve to create interest in the contents. As the argument is directed at the inconsistency of the evidence, and not the sufficiency, we believe it sufficient to simply identify the first magazine by its last word *"Party"*, and the other by its first word *"Sweet."*

**7.** Alexander argues in his reply brief that the court's instruction is constitutionally impermis-

sible because the instruction did not allow the jury to make a specific finding of which item in the two-item counts is obscene. Alexander, however, does not say that he objected to this instruction, and, in any event, we see nothing impermissible about such an instruction.

**8.** In his civil suit, Alexander sought: 1) a declaratory judgment that the application of the RICO statute to obscenity offenses violated his first amendment rights, and 2) a permanent injunc-

standard of obscenity enunciated in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), violates the fifth amendment's due process clause and the first amendment's freedom of speech provision. He claims that the rationales advanced for criminalization of sexually explicit materials are fundamentally antithetical to the constitutional guarantees of free speech and privacy. Alexander goes on to argue that statutes criminalizing the distribution of obscenity are inherently overbroad and that the *Miller* test fails to provide fair notice of prohibited speech and encourages arbitrary enforcement, which renders the federal obscenity statute void for vagueness and unduly chilling free speech.

We summarily reject Alexander's arguments. The district courts did not err in rejecting Alexander's invitation to overturn *Miller.* *See Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 57–58, 109 S.Ct. 916, 924–925, 103 L.Ed.2d 34 (1989) (reaffirming *Miller*). If this is to be done, it must be done by the Supreme Court.

### IV.

■ Alexander argues that the application of the forfeiture provision of 18 U.S.C. § 1962 unconstitutionally criminalizes non-obscene expressive material. He argues that sexually explicit expressive materials are not obscene until a trier of fact in an adversarial judicial proceeding utilizing the three-part test enunciated in *Miller,* 413 U.S. at 23–24, 93 S.Ct. at 2614–2615, finds them to be obscene, and that the *Miller* test must be applied to *all* material the government seeks to restrain. Alexander relies on *Marcus v. Search Warrant of Property,* 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961), and *Vance v. Universal Amusement Company,* 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980), to support his position. Alexander argues that *Near v. Minnesota,* 283 U.S. 697, 51

S.Ct. 625, 75 L.Ed. 1357 (1931), requires that any law restricting speech be tested for its operation and effect on protected speech, and that *Marcus* and *Vance* applied such a test in refusing to endorse obscenity laws that interfered with the sale of non-obscene materials. In *Marcus,* the Supreme Court invalidated the large-scale confiscation of expressive materials without a prior adversarial hearing as an impermissible prior restraint. 367 U.S. at 731–33, 81 S.Ct. at 1715–17. In *Vance,* the Court prohibited the "padlocking" of businesses for up to a year for past violations of obscenity laws as an impermissible prior restraint. 445 U.S. at 317, 100 S.Ct. at 1162. Alexander recognizes that these cases involved prior restraints, but argues that these cases show the need for an adversarial proceeding focusing on the question of obscenity for *all* of the materials finally restrained.

Alexander continues in his argument focusing on section 1962(c), which requires that an accused conduct an enterprise through a pattern of racketeering activity. The nub of Alexander's argument is that to prove a criminal enterprise under RICO, *Miller* requires the government to charge and prove that: (1) all the materials sold by the enterprise taken as a whole are obscene; or (2) all the materials sold by his enterprise considered as individual works are obscene. He claims that the application of section 1962(c) to this case has created the absurd result of criminalizing the sale of millions of dollars of non-obscene materials by an enterprise that during its 20 years of existence sold just four magazines and three videotapes that were later found to be obscene.

The Fourth Circuit rejected many, if not all, of Alexander's arguments in *United States v. Pryba,* 900 F.2d 748 (4th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990). In *Pryba,* the defendants were convicted on seven counts of

tion prohibiting the application of the RICO statute to obscenity offenses. The district court granted the Attorney General's motion to dismiss and motion for summary judgment. *Alexander v. Thornburgh,* 713 F.Supp. 1278 (D.Minn.), *appeal dismissed,* 881 F.2d 1081 (8th

Cir.1989). Alexander's appeal in that case has been consolidated with the appeal from his criminal convictions, and to the extent the issues in his civil appeal are not moot, the issues are discussed in this opinion.

transporting obscene materials in interstate commerce for sale and distribution, and these counts, coupled with prior state obscenity convictions, were used as predicate RICO offenses. The *Pryba* defendants argued that the forfeiture order resulted in "the confiscation and restraint of a vast inventory of presumptively protected expressive material," and the application of the forfeiture provisions resulted in an unconstitutional prior restraint of protected activity. They also argued that the RICO forfeiture provisions violated the first amendment because the provisions lacked the procedural safeguards necessary to insure that protected expression was not erroneously suppressed. *Id.* at 753.

The Fourth Circuit's answer to Pryba's arguments directly applies to the nearly identical arguments made by Alexander. The court stated:

> The forfeiture provided by 18 U.S.C. § 1467 does not violate the First Amendment even though certain materials, books and magazines, that are forfeited, may not be obscene and, in other circumstances, would have constitutional protection as free expression. There was a nexus established between defendants' ill gotten gains from their racketeering activities and the protected materials that were forfeited. The forfeiture did not occur until after defendants were convicted of violating various obscenity statutes and of participating in a racketeering activity, and until after it was established beyond a reasonable doubt that the proceeds from these criminal activities had been used to acquire the arguably protected publications.

*Id.* at 755.

The *Pryba* court rejected an argument that *Fort Wayne Books* required a different conclusion and stated further:

> The forfeiture of nonobscene books, magazines and video tapes, after a conviction of racketeering involving the sale of obscene goods and after the jury has determined that the forfeited materials were acquired or maintained in violation of 18 U.S.C. § 1962 and afforded the Prybas a source of influence over the

racketeering enterprise, does not violate the First Amendment. The fact that some of the materials forfeited are not obscene does not protect them from forfeiture when the procedures established by RICO are followed, as they were in the present case.

*Id.* at 756.

Alexander argues that the decision of the Fourth Circuit in *Pryba* is not applicable as it dealt with a facial challenge to the RICO forfeiture statute and not to the unconstitutional application of section 1962.

We reject Alexander's distinction. As in *Pryba*, a jury convicted Alexander on the RICO charges brought under 18 U.S.C. § 1962(c) and predicate obscenity offenses under 18 U.S.C. § 1465. (Here, Alexander was also convicted under section 1466). Like *Pryba*, the jury found some items charged in the indictment obscene, some not, and was unable to reach a verdict on others. In both cases, after the jury reached a verdict finding violations of 18 U.S.C. § 1962, the same jury heard additional testimony on the issue of forfeiture, found that the defendants had an interest in property that gave them a source of influence over the enterprise, and ordered that certain of the assets, including the bookstores and video stores, be forfeited. *Pryba* differed from the case before us in that fifteen prior obscenity convictions of the corporate defendant were introduced in evidence. *Id.* at 758. Nevertheless, with this exception, the facts in *Pryba* are nearly identical to those here.

Furthermore, the government argues with persuasive force that in addition to the thirteen magazines and videos that were introduced, it was prepared to offer additional items not named in the indictment. On the state of this record, Alexander may not now argue that the jury must have found all of the materials seized in the forfeiture proceedings obscene under *Miller*.

In his reply brief, Alexander asserts that *Sable Communications v. Federal Communications Commission*, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), further supports his argument that the appli-

cation of the RICO forfeiture provision unconstitutionally criminalized the sale of expressive material.

In *Sable*, the Supreme Court examined the constitutionality of a federal criminal statute prohibiting the sale of "indecent" or "obscene" commercial telephone messages. *Id.* at 117, 109 S.Ct. at 2832. The Court upheld the criminal prohibition against obscene messages, but struck down the ban on indecent messages. *Id.* Alexander argues that based on *Sable*, the government cannot criminally prosecute Alexander for selling non-obscene material any more than Congress could criminalize the sale of non-obscene messages.

Alexander's argument misses the mark. Alexander was not prosecuted for selling non-obscene material, and *Sable* has no bearing on the facts presented in this case. For the several reasons discussed, we reject Alexander's argument that the application of 18 U.S.C. § 1962 unconstitutionally criminalizes non-obscene expressive materials.

## V.

Alexander next argues in both his civil and criminal appeals that the application of the RICO forfeiture provisions violates the first amendment.[9] Specifically, he contends that the forfeiture results in an unconstitutional prior restraint, imposes an unconstitutional chilling effect on constitutionally protected expression, and is constitutionally overbroad. The Fourth Circuit summarily rejected these same arguments in *Pryba*, concluding that "[o]bscenity is not protected by the First Amendment and a convicted racketeer may not launder his dirty money by investing it in materials that involve protected speech." 900 F.2d at 756.

Alexander, like the *Pryba* defendants, relies on *Fort Wayne Books* to support his position that the application of the RICO forfeiture provisions causes an unconstitutional prior restraint. There is, however, no similarity to the procedural posture in this case and the *pretrial* seizure con-

demned in *Fort Wayne Books*. 489 U.S. at 66, 109 S.Ct. at 929.

Alexander's convictions on obscenity counts may serve as a predicate to a RICO violation, and do not constitute a prior restraint. The First Amendment is not violated when there is a nexus established between the ill-gotten gains from racketeering activity and the protected materials forfeited. *Pryba*, 900 F.2d at 755.

Here, the RICO forfeiture provisions constitute a criminal penalty imposed following a conviction for conducting an enterprise engaged in racketeering activities. Courts have recognized the substantial difference between prior restraints and criminal penalties. *See, e.g., Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 705–06 & n. 2, 106 S.Ct. 3172, 3176–77 & n. 2, 92 L.Ed.2d 568 (1986); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 558–59, 95 S.Ct. 1239, 1246–47, 43 L.Ed.2d 448 (1975); *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 441–45, 77 S.Ct. 1325, 1327–28, 1 L.Ed.2d 1469 (1957).

Alexander next argues that the forfeiture imposes an unconstitutional chilling effect on protected expression. The Supreme Court has directly addressed the chilling effect from the application of the RICO forfeiture provisions to obscenity offenses and to first amendment protected materials:

> It may be true that the stiffer RICO penalties will provide an additional deterrent to those who might otherwise sell obscene materials; perhaps this means ... that some cautious booksellers will practice self-censorship and remove First Amendment protected materials from their shelves. But deterrence of the sale of obscene materials is a legitimate end of state anti-obscenity laws, and our cases have long recognized the practical reality that "any form of criminal obscenity statute applicable to a bookseller will induce some tendency to self-censorship and have some inhibitory effect on the dissemination of material not ob-

9. The district court rejected Alexander's facial challenge to the application of the RICO forfeiture provisions in *United States v. Alexander,* 736 F.Supp. 968, 977–80 (D.Minn.1990).

scene." The mere assertion of some possible self-censorship resulting from a statute is not enough to render an anti-obscenity law unconstitutional under our precedents.

*Fort Wayne Books*, 489 U.S. at 60, 109 S.Ct. at 925 (citing *Smith v. California*, 361 U.S. 147, 154–55, 80 S.Ct. 215, 219–20, 4 L.Ed.2d 205 (1959)).

We reject Alexander's argument that the forfeiture provisions have an unconstitutionally chilling effect on first amendment rights.

We also reject Alexander's argument that the reach of the RICO forfeiture provisions is unconstitutionally overbroad. In *Arcara*, the Supreme Court upheld the closure of a bookstore that had been used as a front for prostitution. The Court stated that criminal and civil sanctions are not subject to " 'least restrictive means scrutiny' " because a particular remedy "will have some effect on the First Amendment activities of those subject to sanction." 478 U.S. at 706, 106 S.Ct. at 3177.

Here, the court specifically and properly limited the forfeiture to profits, real estate, and businesses directly related to Alexander's interstate transportation and sale of obscene magazines and videos. The forfeiture is not unconstitutionally overbroad.[10]

## VI.

Alexander argues that his sentence, primarily the forfeiture order, violates the eighth amendment prohibition against cruel and unusual punishments and excessive fines.

The Supreme Court has set forth a three-part test for determining whether a sentence violates the eighth amendment. The test requires a comparison of: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed for the same or similar offenses in the same jurisdiction; and (3) the sentences imposed for

the same or similar offenses in other jurisdictions. *Solem v. Helm*, 463 U.S. 277, 290–92, 103 S.Ct. 3001, 3009–11, 77 L.Ed.2d 637 (1983).

A sentence imposed is entitled to "substantial deference" and we may only consider "whether the sentence ... is within the constitutional limits." *Solem*, 463 U.S. at 290 and n. 16, 103 S.Ct. at 3009 and n. 16.

■ The district court imposed Alexander's prison sentence based on the Sentencing Guidelines. 28 U.S.C. § 994 (1988). Alexander does not specifically attack his prison sentence. Instead, he appeals from the forfeiture order arguing once again that the income "from the two patterns of racketeering amoun[t] only to an infinitesimal percentage of his legitimate income," and that when the forfeiture is combined with the fine and prison sentence, the "harshness" of the penalty is "amazingly unfair."

Alexander cites one decision in which the Ninth Circuit remanded the case for a determination of whether the forfeiture was grossly disproportionate or excessive, *United States v. Busher*, 817 F.2d 1409, 1414–16 (9th Cir.1987), and contends that this case should be followed here.

Nevertheless, in the only other RICO-obscenity case in the country, the Fourth Circuit held that the forfeiture of a business with total annual sales of $2 million as a result of $105.30 of material found to be obscene did not constitute a cruel and unusual punishment or an excessive fine prohibited by the eighth amendment. *Pryba*, 900 F.2d at 753, 756–57. The Fourth Circuit added that it was not even required to conduct a proportionality review because the defendants did not receive a sentence of sufficient severity. *Id.* at 757 (citing *United States v. Whitehead*, 849 F.2d 849, 860 (4th Cir.), *cert. denied*, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988);

---

**10.** Alexander also argues that the court should have applied a remedy requiring forfeiture of proceeds which were proportional or traceable to the sale of obscene material. There is, however, no requirement that courts engage in such a test in applying the RICO forfeiture provi-

sions. *See, e.g., United States v. Regan*, 858 F.2d 115, 119 (2d Cir.1988); *United States v. Kravitz*, 738 F.2d 102, 104–05 (3d Cir.1984), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1752, 84 L.Ed.2d 816 (1985).

*United States v. Rhodes,* 779 F.2d 1019, 1027–28 (4th Cir.1985), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986)). *"Solem v. Helm* does not require a proportionality review of any sentence less than life imprisonment without the possibility of parole." *Pryba,* 900 F.2d at 757 (citation omitted). We cannot conclude that the district court abused its discretion in·sentencing Alexander.

## VII.

Finally, Alexander argues that the evidence was insufficient to support his convictions on the tax counts, social security counts, and all other counts. He adds in his reply brief that the evidence was insufficient to support his RICO convictions, arguing that the government failed to show that proceeds from a pattern of racketeering activity were invested in a criminal enterprise, or a criminal enterprise existed as required by 18 U.S.C. § 1962. We have carefully reviewed Alexander's arguments and record at trial. We are satisfied that there is ample evidence to support Alexander's convictions on all counts.

Having carefully considered all of Alexander's arguments, we affirm Alexander's convictions, and the orders of forfeiture and summary judgment.