# ALEXANDER *v.* UNITED STATES

No. 91–1526.   Argued January 12, 1993—Decided June 28, 1993

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, O'CONNOR, SCALIA, and THOMAS, JJ., joined. SOUTER, J., filed an opinion concurring in the judgment in part and dissenting in part, *post*, p. 559. KENNEDY, J., filed a dissenting opinion, in which BLACKMUN and STEVENS, JJ., joined, and in Part II of which SOUTER, J., joined, *post*, p. 560.

*John H. Weston* argued the cause for petitioner. With him on the briefs was *G. Randall Garrou.*

*Solicitor General Starr* argued the cause for the United States. With him on the brief were *Assistant Attorney General Mueller, Deputy Solicitor General Bryson,* and *Paul J. Larkin, Jr.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

After a full criminal trial, petitioner Ferris J. Alexander, owner of more than a dozen stores and theaters dealing in sexually explicit materials, was convicted on, *inter alia,* 17 obscenity counts and 3 counts of violating the Racketeer Influenced and Corrupt Organizations Act (RICO). The obscenity convictions, based on the jury's findings that four magazines and three videotapes sold at several of petitioner's stores were obscene, served as the predicates for his three RICO convictions. In addition to imposing a prison term and fine, the District Court ordered petitioner to forfeit, pursuant to 18 U. S. C. § 1963 (1988 ed. and Supp. III), certain assets that were directly related to his racketeering activity as punishment for his RICO violations. Petitioner argues that this forfeiture violated the First and Eighth Amendments to the Constitution. We reject petitioner's

---

*Briefs of *amici curiae* urging reversal were filed for the American Booksellers Foundation for Free Expression et al. by *Michael A. Bamberger;* for the American Civil Liberties Union et al. by *Marvin E. Frankel, Steven R. Shapiro,* and *Marjorie Heins;* for the American Library Association et al. by *Bruce J. Ennis, Jr.,* and *David W. Ogden;* for Feminists for Free Expression by *Helen M. Mickiewicz;* and for the Video Software Dealers Association by *Charles B. Ruttenberg, James P. Mercurio,* and *Theodore D. Frank.*

Briefs of *amici curiae* urging affirmance were filed for Christian Legal Defense by *Wendell R. Bird* and *David J. Myers;* for the National Family Legal Foundation et al. by *James P. Mueller* and *Len L. Munsil;* for Morality in Media, Inc., by *Paul J. McGeady;* and for the Religious Alliance Against Pornography et al. by *H. Robert Showers.*

claims under the First Amendment but remand for reconsideration of his Eighth Amendment challenge.

Petitioner was in the so-called "adult entertainment" business for more than 30 years, selling pornographic magazines and sexual paraphernalia, showing sexually explicit movies, and eventually selling and renting videotapes of a similar nature. He received shipments of these materials at a warehouse in Minneapolis, Minnesota, where they were wrapped in plastic, priced, and boxed. He then sold his products through some 13 retail stores in several different Minnesota cities, generating millions of dollars in annual revenues. In 1989, federal authorities filed a 41-count indictment against petitioner and others, alleging, *inter alia*, operation of a racketeering enterprise in violation of RICO. The indictment charged 34 obscenity counts and 3 RICO counts, the racketeering counts being predicated on the obscenity charges. The indictment also charged numerous counts of tax evasion and related offenses that are not relevant to the questions before us.

Following a 4-month jury trial in the United States District Court for the District of Minnesota, petitioner was convicted of 17 substantive obscenity offenses: 12 counts of transporting obscene material in interstate commerce for the purpose of sale or distribution, in violation of 18 U. S. C. § 1465; and 5 counts of engaging in the business of selling obscene material, in violation of 18 U. S. C. § 1466 (1988 ed. and Supp. III). He also was convicted of 3 RICO offenses that were predicated on the obscenity convictions: one count of receiving and using income derived from a pattern of racketeering activity, in violation of 18 U. S. C. § 1962(a); one count of conducting a RICO enterprise, in violation of § 1962(c); and one count of conspiring to conduct a RICO enterprise, in violation of § 1962(d). As a basis for the obscenity and RICO convictions, the jury determined that four magazines and three videotapes were obscene. Multiple copies of these magazines and videos, which graphically de-

picted a variety of "hard core" sexual acts, were distributed throughout petitioner's adult entertainment empire.

Petitioner was sentenced to a total of six years in prison, fined $100,000, and ordered to pay the cost of prosecution, incarceration, and supervised release. In addition to these punishments, the District Court reconvened the same jury and conducted a forfeiture proceeding pursuant to § 1963(a)(2). At this proceeding, the Government sought forfeiture of the businesses and real estate that represented petitioner's interest in the racketeering enterprise, § 1963(a)(2)(A), the property that afforded petitioner influence over that enterprise, § 1963(a)(2)(D), and the assets and proceeds petitioner had obtained from his racketeering offenses, §§ 1963(a)(1), (3). The jury found that petitioner had an interest in 10 pieces of commercial real estate and 31 current or former businesses, all of which had been used to conduct his racketeering enterprise. Sitting without the jury, the District Court then found that petitioner had acquired a variety of assets as a result of his racketeering activities. The court ultimately ordered petitioner to forfeit his wholesale and retail businesses (including all the assets of those businesses) and almost $9 million in moneys acquired through racketeering activity.[1]

The Court of Appeals affirmed the District Court's forfeiture order. *Alexander* v. *Thornburgh*, 943 F. 2d 825 (CA8 1991). It rejected petitioner's argument that the application of RICO's forfeiture provisions constituted a prior restraint on speech and hence violated the First Amendment. Recognizing the well-established distinction between prior restraints and subsequent criminal punishments, the Court of Appeals found that the forfeiture here was "a criminal

---

[1] Not wishing to go into the business of selling pornographic materials—regardless of whether they were legally obscene—the Government decided that it would be better to destroy the forfeited expressive materials than sell them to members of the public. See Brief for United States 26–27, n. 11.

penalty imposed following a conviction for conducting an enterprise engaged in racketeering activities," and not a prior restraint on speech. *Id.*, at 834. The court also rejected petitioner's claim that RICO's forfeiture provisions are constitutionally overbroad, pointing out that the forfeiture order was properly limited to assets linked to petitioner's past racketeering offenses. *Id.*, at 835. Lastly, the Court of Appeals concluded that the forfeiture order does not violate the Eighth Amendment's prohibition against "cruel and unusual punishments" and "excessive fines." In so ruling, however, the court did not consider whether the forfeiture in this case was grossly disproportionate or excessive, believing that the Eighth Amendment " 'does not require a proportionality review of any sentence less than life imprisonment without the possibility of parole.' " *Id.*, at 836 (quoting *United States* v. *Pryba*, 900 F. 2d 748, 757 (CA4), cert. denied, 498 U. S. 924 (1990)). We granted certiorari, 505 U. S. 1217 (1992).

Petitioner first contends that the forfeiture in this case, which effectively shut down his adult entertainment business, constituted an unconstitutional prior restraint on speech, rather than a permissible criminal punishment. According to petitioner, forfeiture of expressive materials and the assets of businesses engaged in expressive activity, when predicated solely upon previous obscenity violations, operates as a prior restraint because it prohibits future presumptively protected expression in retaliation for prior unprotected speech. Practically speaking, petitioner argues, the effect of the RICO forfeiture order here was no different from the injunction prohibiting the publication of expressive material found to be a prior restraint in *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697 (1931). As petitioner puts it, see Brief for Petitioner 25, the forfeiture order imposed a complete *ban* on his future expression because of previous unprotected speech. We disagree. By lumping the forfeiture imposed in this case after a full criminal trial with an injunction enjoining future speech, petitioner stretches the term "prior

restraint" well beyond the limits established by our cases. To accept petitioner's argument would virtually obliterate the distinction, solidly grounded in our cases, between prior restraints and subsequent punishments.

The term "prior restraint" is used "to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4–14 (1984) (emphasis added). Temporary restraining orders and permanent injunctions—*i. e.*, court orders that actually forbid speech activities—are classic examples of prior restraints. See *id.*, § 4.03, at 4–16. This understanding of what constitutes a prior restraint is borne out by our cases, even those on which petitioner relies. In *Near* v. *Minnesota ex rel. Olson, supra,* we invalidated a court order that perpetually enjoined the named party, who had published a newspaper containing articles found to violate a state nuisance statute, from producing any future "malicious, scandalous or defamatory" publication. *Id.*, at 706. *Near,* therefore, involved a true restraint on future speech—a permanent injunction. So, too, did *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415 (1971), and *Vance* v. *Universal Amusement Co.*, 445 U. S. 308 (1980) *(per curiam),* two other cases cited by petitioner. In *Keefe,* we vacated an order *"enjoining* petitioners from distributing leaflets anywhere in the town of Westchester, Illinois." 402 U. S., at 415 (emphasis added). And in *Vance,* we struck down a Texas statute that authorized courts, upon a showing that obscene films had been shown in the past, to issue an injunction of indefinite duration prohibiting the future exhibition of films that have not yet been found to be obscene. 445 U. S., at 311. See also *New York Times Co.* v. *United States,* 403 U. S. 713, 714 (1971) *(per curiam)* (Government sought to enjoin publication of the Pentagon Papers).

By contrast, the RICO forfeiture order in this case does not *forbid* petitioner to engage in any expressive activi-

ties in the future, nor does it require him to obtain prior approval for any expressive activities. It only deprives him of specific assets that were found to be related to his previous racketeering violations. Assuming, of course, that he has sufficient untainted assets to open new stores, restock his inventory, and hire staff, petitioner can go back into the adult entertainment business tomorrow, and sell as many sexually explicit magazines and videotapes as he likes, without any risk of being held in contempt for violating a court order. Unlike the injunctions in *Near, Keefe,* and *Vance,* the forfeiture order in this case imposes no legal impediment to—no prior restraint on—petitioner's ability to engage in any expressive activity he chooses. He is perfectly free to open an adult bookstore or otherwise engage in the production and distribution of erotic materials; he just cannot finance these enterprises with assets derived from his prior racketeering offenses.

The constitutional infirmity in nearly all of our prior restraint cases involving obscene material, including those on which petitioner and the dissent rely, see *post,* at 570–571, 577, was that the government had seized or otherwise restrained materials suspected of being obscene without a prior judicial determination that they were in fact so. See, *e. g., Marcus* v. *Search Warrant of Kansas City, Mo., Property,* 367 U. S. 717 (1961); *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58 (1963); *Quantity of Copies of Books* v. *Kansas,* 378 U. S. 205 (1964); *Roaden* v. *Kentucky,* 413 U. S. 496 (1973); *Vance, supra.* In this case, however, the assets in question were ordered forfeited not because they were believed to be obscene, but because they were directly related to petitioner's past racketeering violations. The RICO forfeiture statute calls for the forfeiture of assets because of the financial role they play in the operation of the racketeering enterprise. The statute is oblivious to the expressive or nonexpressive nature of the assets forfeited; books, sports cars, narcotics, and cash are all forfeitable alike under RICO.

Indeed, a contrary scheme would be disastrous from a policy standpoint, enabling racketeers to evade forfeiture by investing the proceeds of their crimes in businesses engaging in expressive activity.

Nor were the assets in question ordered forfeited without according petitioner the requisite procedural safeguards, another recurring theme in our prior restraint cases. Contrasting this case with *Fort Wayne Books, Inc.* v. *Indiana,* 489 U. S. 46 (1989), aptly illustrates this point. In *Fort Wayne Books,* we rejected on constitutional grounds the pretrial seizure of certain expressive material that was based upon a finding of "no more than *probable cause to believe* that a RICO violation had occurred." *Id.,* at 66 (emphasis in original). In so holding, we emphasized that there had been no prior judicial "determination that the seized items were 'obscene' or that a RICO violation *ha[d] occurred.*" *Ibid.* (emphasis in original). "[M]ere probable cause to believe a legal violation ha[d] transpired," we said, "is not adequate to remove books or films from circulation." *Ibid.* Here, by contrast, the seizure was not premature, because the Government established beyond a reasonable doubt the basis for the forfeiture. Petitioner had a full criminal trial on the merits of the obscenity and RICO charges during which the Government proved that four magazines and three videotapes were obscene and that the other forfeited assets were directly linked to petitioner's commission of racketeering offenses.

Petitioner's claim that the RICO forfeiture statute operated as an unconstitutional prior restraint in this case is also inconsistent with our decision in *Arcara* v. *Cloud Books, Inc.,* 478 U. S. 697 (1986). In that case, we sustained a court order, issued under a general nuisance statute, that closed down an adult bookstore that was being used as a place of prostitution and lewdness. In rejecting out-of-hand a claim that the closure order amounted to an improper prior restraint on speech, we stated:

> "The closure order sought in this case differs from a prior restraint in two significant respects. First, the order would impose no restraint at all on the dissemination of particular materials, since respondents are free to carry on their bookselling business at another location, even if such locations are difficult to find. Second, the closure order sought would not be imposed on the basis of an advance determination that the distribution of particular materials is prohibited—indeed, the imposition of the closure order has nothing to do with any expressive conduct at all." *Id.*, at 705–706, n. 2.

This reasoning applies with equal force to this case, and thus confirms that the RICO forfeiture order was not a prior restraint on speech, but a punishment for past criminal conduct. Petitioner attempts to distinguish *Arcara* on the ground that obscenity, unlike prostitution or lewdness, has "'a significant expressive element.'" Brief for Petitioner 16 (quoting *Arcara, supra,* at 706). But that distinction has no bearing on the question whether the forfeiture order in this case was an impermissible prior restraint.

Finally, petitioner's proposed definition of the term "prior restraint" would undermine the time-honored distinction between barring speech in the future and penalizing past speech. The doctrine of prior restraint originated in the common law of England, where prior restraints of the press were not permitted, but punishment after publication was. This very limited application of the principle of freedom of speech was held inconsistent with our First Amendment as long ago as *Grosjean* v. *American Press Co.,* 297 U. S. 233, 246 (1936). While we may have given a broader definition to the term "prior restraint" than was given to it in English common law,[2] our decisions have steadfastly preserved the

---

[2] The doctrine of prior restraint has its roots in the 16th- and 17th-century English system of censorship. Under that system, all printing presses and printers were licensed by the government, and nothing could lawfully be published without the prior approval of a government or

distinction between prior restraints and subsequent punishments. Though petitioner tries to dismiss this distinction as "neither meaningful nor useful," Brief for Petitioner 29, we think it is critical to our First Amendment jurisprudence. Because we have interpreted the First Amendment as providing greater protection from prior restraints than from subsequent punishments, see *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 558–559 (1975), it is important for us to delineate with some precision the defining characteristics of a prior restraint. To hold that the forfeiture order in this case constituted a prior restraint would have the exact opposite effect: It would blur the line separating prior restraints from subsequent punishments to such a degree that it would be impossible to determine with any certainty whether a particular measure is a prior restraint or not.

In sum, we think that fidelity to our cases requires us to analyze the forfeiture here not as a prior restraint, but under normal First Amendment standards. So analyzing it, we find that petitioner's claim falls well short of the mark. He does not challenge either his 6-year jail sentence or his $100,000 fine as violative of the First Amendment. The first inquiry that comes to mind, then, is why, if incarceration for six years and a fine of $100,000 are permissible forms of punishment under the RICO statute, the challenged forfeiture of certain assets directly related to petitioner's racketeering activity is not. Our cases support the instinct from which

church censor. See generally T. Emerson, System of Freedom of Expression 504 (1970). Beginning with *Near* v. *Minnesota ex rel. Olson,* 283 U. S. 697 (1931), we expanded this doctrine to include not only licensing schemes requiring speech to be submitted to an administrative censor for prepublication review, but also injunctions against future speech issued by judges. See *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations,* 413 U. S. 376, 389–390 (1973) ("[T]he protection against prior restraint at common law barred only a system of administrative censorship. . . . [T]he Court boldly stepped beyond this narrow doctrine in *Near*"). Quite obviously, however, we have never before countenanced the essentially limitless expansion of the term that petitioner proposes.

this question arises; they establish quite clearly that the First Amendment does not prohibit either stringent criminal sanctions for obscenity offenses or forfeiture of expressive materials as punishment for criminal conduct.

We have in the past rejected First Amendment challenges to statutes that impose severe prison sentences and fines as punishment for obscenity offenses. See, e. g., *Ginzburg* v. *United States*, 383 U. S. 463, 464–465, n. 2 (1966); *Smith* v. *United States*, 431 U. S. 291, 296, n. 3 (1977); *Fort Wayne Books*, 489 U. S., at 59, n. 8. Petitioner does not question the holding of those cases; he instead argues that RICO's forfeiture provisions are constitutionally overbroad because they are not limited solely to obscene materials and the proceeds from the sale of such materials. Petitioner acknowledges that this is an unprecedented use of the overbreadth principle. See Brief for Petitioner 36. The "overbreadth" doctrine, which is a departure from traditional rules of standing, permits a defendant to make a facial challenge to an overly broad statute restricting speech, even if he himself has engaged in speech that could be regulated under a more narrowly drawn statute. See, e. g., *Broadrick* v. *Oklahoma*, 413 U. S. 601, 612–613 (1973); *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 798–801 (1984). But the RICO statute does not criminalize constitutionally protected speech and therefore is materially different from the statutes at issue in our overbreadth cases. Cf., e. g., *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.*, 482 U. S. 569, 574–575 (1987).

Petitioner's real complaint is not that the RICO statute is overbroad, but that applying RICO's forfeiture provisions to businesses dealing in expressive materials may have an improper "chilling" effect on free expression by deterring others from engaging in protected speech. No doubt the monetarily large forfeiture in this case may induce cautious booksellers to practice self-censorship and remove marginally protected materials from their shelves out of fear that

those materials could be found obscene and thus subject them to forfeiture. But the defendant in *Fort Wayne Books* made a similar argument, which was rejected by the Court in this language:

> "[D]eterrence of the sale of obscene materials is a legitimate end of state antiobscenity laws, and our cases have long recognized the practical reality that 'any form of criminal obscenity statute applicable to a bookseller will induce some tendency to self-censorship and have some inhibitory effect on the dissemination of material not obscene.'" 489 U. S., at 60 (quoting *Smith* v. *California*, 361 U. S. 147, 154–155 (1959)).

*Fort Wayne Books* is dispositive of any chilling argument here, since the threat of forfeiture has no more of a chilling effect on free expression than the threat of a prison term or a large fine. Each racketeering charge exposes a defendant to a maximum penalty of 20 years' imprisonment and a fine of up to $250,000. 18 U. S. C. § 1963(a) (1988 ed. and Supp. III). See Brief for United States 19. Needless to say, the prospect of such a lengthy prison sentence would have a far more powerful deterrent effect on protected speech than the prospect of any sort of forfeiture. Cf. *Blanton* v. *North Las Vegas*, 489 U. S. 538, 542 (1989) (loss of liberty is a more severe form of punishment than any monetary sanction). Similarly, a fine of several hundred thousand dollars would certainly be just as fatal to most businesses—and, as such, would result in the same degree of self-censorship—as a forfeiture of assets. Yet these penalties are clearly constitutional under *Fort Wayne Books*.

We also have rejected a First Amendment challenge to a court order closing down an entire business that was engaged in expressive activity as punishment for criminal conduct. See *Arcara*, 478 U. S., at 707. Once again, petitioner does not question the holding of that case; in fact, he concedes that expressive businesses and assets can be forfeited

under RICO as punishment for, say, narcotic offenses. See Brief for Petitioner 11 ("[F]orfeiture of a media business purchased by a drug cartel would be constitutionally permissible"). Petitioner instead insists that the result here should be different because the RICO predicate acts were obscenity offenses. In *Arcara*, we held that criminal and civil sanctions having some incidental effect on First Amendment activities are subject to First Amendment scrutiny "only where it was conduct with a significant expressive element that drew the legal remedy in the first place, as in [*United States* v.] *O'Brien*, [391 U. S. 367 (1968),] or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity, as in *Minneapolis Star* [*& Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575 (1983)]." 478 U. S., at 706–707 (footnote omitted). Applying that standard, we held that prostitution and lewdness, the criminal conduct at issue in *Arcara*, involve neither situation, and thus concluded that the First Amendment was not implicated by the enforcement of a general health regulation resulting in the closure of an adult bookstore. *Id.*, at 707. Under our analysis in *Arcara*, the forfeiture in this case cannot be said to offend the First Amendment. To be sure, the conduct that "drew the legal remedy" here—racketeering committed through obscenity violations—may be "expressive," see *R. A. V.* v. *St. Paul*, 505 U. S. 377, 385 (1992), but our cases clearly hold that "obscenity" can be regulated or actually proscribed consistent with the First Amendment, see, *e. g., Roth* v. *United States*, 354 U. S. 476, 485 (1957); *Miller* v. *California*, 413 U. S. 15, 23 (1973).

Confronted with our decisions in *Fort Wayne Books* and *Arcara*—neither of which he challenges—petitioner's position boils down to this: Stiff criminal penalties for obscenity offenses are consistent with the First Amendment; so is the forfeiture of expressive materials as punishment for criminal conduct; but the combination of the two somehow results

in a violation of the First Amendment. We reject this counterintuitive conclusion, which in effect would say that the whole is greater than the sum of the parts.

Petitioner also argues that the forfeiture order in this case—considered atop his 6-year prison term and $100,000 fine—is disproportionate to the gravity of his offenses and therefore violates the Eighth Amendment, either as a "cruel and unusual punishment" or as an "excessive fine."[3] Brief for Petitioner 40. The Court of Appeals, though, failed to distinguish between these two components of petitioner's Eighth Amendment challenge. Instead, the court lumped the two together, disposing of them both with the general statement that the Eighth Amendment does not require any proportionality review of a sentence less than life imprisonment without the possibility of parole. 943 F. 2d, at 836. But that statement has relevance only to the Eighth Amendment's prohibition against cruel and unusual punishments. Unlike the Cruel and Unusual Punishments Clause, which is concerned with matters such as the duration or conditions of confinement, "[t]he Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Austin* v. *United States, post,* at 609–610 (emphasis and internal quotation marks omitted); accord, *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.,* 492 U. S. 257, 265 (1989) ("[A]t the time of the drafting and ratification of the [Eighth] Amendment, the word 'fine' was understood to mean a payment to a sovereign as punishment for some offense"); *id.,* at 265, n. 6. The *in personam* criminal forfeiture at issue here is clearly a form of monetary punishment no different, for Eighth Amendment purposes, from a traditional "fine." Ac-

---

[3] This sense of disproportionality animates much of petitioner's First Amendment arguments as well. Questions of proportionality, however, should be dealt with directly and forthrightly under the Eighth Amendment and not be allowed to influence *sub silentio* courts' First Amendment analysis.

cord, *Austin, supra.*[4] Accordingly, the forfeiture in this case should be analyzed under the Excessive Fines Clause.

Petitioner contends that forfeiture of his entire business was an "excessive" penalty for the Government to exact "[o]n the basis of a few materials the jury ultimately decided were obscene." Brief for Petitioner 40. It is somewhat misleading, we think, to characterize the racketeering crimes for which petitioner was convicted as involving just a few materials ultimately found to be obscene. Petitioner was convicted of creating and managing what the District Court described as "an enormous racketeering enterprise." App. to Pet. for Cert. 160. It is in the light of the extensive criminal activities which petitioner apparently conducted through this racketeering enterprise over a substantial period of time that the question whether the forfeiture was "excessive" must be considered. We think it preferable that this question be addressed by the Court of Appeals in the first instance.

For these reasons, we hold that RICO's forfeiture provisions, as applied in this case, did not violate the First Amendment, but that the Court of Appeals should have considered whether they resulted in an "excessive" penalty within the meaning of the Eighth Amendment's Excessive Fines Clause. Accordingly, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SOUTER, concurring in the judgment in part and dissenting in part.

I agree with the Court that petitioner has not demonstrated that the forfeiture at issue here qualifies as a prior restraint as we have traditionally understood that term. I

---

[4] Unlike *Austin,* this case involves *in personam* criminal forfeiture not *in rem* civil forfeiture, so there was no threshold question concerning the applicability of the Eighth Amendment.

also agree with the Court that the case should be remanded for a determination whether the forfeiture violated the Excessive Fines Clause of the Eighth Amendment. Nonetheless, I agree with JUSTICE KENNEDY that the First Amendment forbids the forfeiture of petitioner's expressive material in the absence of an adjudication that it is obscene or otherwise of unprotected character, and therefore I join Part II of his dissenting opinion.

JUSTICE KENNEDY, with whom JUSTICE BLACKMUN and JUSTICE STEVENS join, and with whom JUSTICE SOUTER joins as to Part II, dissenting.

The Court today embraces a rule that would find no affront to the First Amendment in the Government's destruction of a book and film business and its entire inventory of legitimate expression as punishment for a single past speech offense. Until now I had thought one could browse through any book or film store in the United States without fear that the proprietor had chosen each item to avoid risk to the whole inventory and indeed to the business itself. This ominous, onerous threat undermines free speech and press principles essential to our personal freedom.

Obscenity laws would not work unless an offender could be arrested and imprisoned despite the resulting chill on his own further speech. But, at least before today, we have understood state action directed at protected books or other expressive works themselves to raise distinct constitutional concerns. The Court's decision is a grave repudiation of First Amendment principles, and with respect I dissent.

# I

## A

The majority believes our cases "establish quite clearly that the First Amendment does not prohibit either stringent criminal sanctions for obscenity offenses or forfeiture of expressive materials as punishment for criminal conduct."

*Ante,* at 555. True, we have held that obscenity is expression which can be regulated and punished, within proper limitations, without violating the First Amendment. See, *e. g., New York* v. *Ferber,* 458 U. S. 747 (1982); *Miller* v. *California,* 413 U. S. 15 (1973); *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 57–58 (1973); *Roth* v. *United States,* 354 U. S. 476 (1957). And the majority is correct to note that we have upheld stringent fines and jail terms as punishments for violations of the federal obscenity laws. See *Fort Wayne Books, Inc.* v. *Indiana,* 489 U. S. 46, 60 (1989); *Ginzburg* v. *United States,* 383 U. S. 463, 464–465, n. 2 (1966). But that has little to do with the destruction of protected titles and the facilities for their distribution or publication. None of our cases address that matter, or it would have been unnecessary for us to reserve the specific question four Terms ago in *Fort Wayne Books, Inc.* v. *Indiana, supra,* at 60, 65.

The fundamental defect in the majority's reasoning is a failure to recognize that the forfeiture here cannot be equated with traditional punishments such as fines and jail terms. Noting that petitioner does not challenge either the 6-year jail sentence or the $100,000 fine imposed against him as punishment for his convictions under the Racketeer Influenced and Corrupt Organizations Act (RICO), the majority ponders why RICO's forfeiture penalty should be any different. See *ante,* at 554. The answer is that RICO's forfeiture penalties are different from traditional punishments by Congress' own design as well as in their First Amendment consequences.

The federal RICO statute was passed to eradicate the infiltration of legitimate business by organized crime. Pub. L. 91–452, Title IX, 84 Stat. 941, as amended, 18 U. S. C. §§ 1961–1968 (1988 ed. and Supp. III). Earlier steps to combat organized crime were not successful, in large part because traditional penalties targeted individuals engaged in racketeering activity rather than the criminal enterprise itself. Punishing racketeers with fines and jail terms failed to

break the cycle of racketeering activity because the criminal enterprises had the resources to replace convicted racketeers with new recruits. In passing RICO, Congress adopted a new approach aimed at the economic roots of organized crime:

> "What is needed here . . . are new approaches that will deal not only with individuals, but also with the economic base through which those individuals constitute such a serious threat to the economic well-being of the Nation. In short, an attack must be made on their source of economic power itself, and the attack must take place on all available fronts." S. Rep. No. 91–617, p. 79 (1969).

Criminal liability under RICO is premised on the commission of a "pattern of racketeering activity," defined by the statute as engaging in two or more related predicate acts of racketeering within a 10-year period. 18 U. S. C. § 1961(5). A RICO conviction subjects the violator not only to traditional, though stringent, criminal fines and prison terms, but also mandatory forfeiture under § 1963.* It is the mandatory forfeiture penalty that is at issue here.

---

*Section 1963(a) provides that in imposing sentence on one convicted of racketeering offenses under § 1962, the district court *shall order* forfeiture of three classes of assets:

"(1) any interest the person has acquired or maintained in violation of section 1962;

"(2) any—

"(A) interest in;

"(B) security of;

"(C) claim against; or

"(D) property or contractual right of any kind affording a source of influence over;

"any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

"(3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or

While forfeiture remedies have been employed with increasing frequency in civil proceedings, forfeiture remedies and penalties are the subject of historic disfavor in our country. Although *in personam* forfeiture statutes were well grounded in the English common law, see *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U. S. 663, 682–683 (1974), *in personam* criminal forfeiture penalties like those authorized under § 1963 were unknown in the federal system until the enactment of RICO in 1970. See 1 C. Wright, Federal Practice and Procedure § 125.1, p. 389 (2d ed. 1982). Section 1963's forfeiture penalties are novel for their punitive character as well as for their unprecedented sweep. Civil *in rem* forfeiture is limited in application to contraband and articles put to unlawful use, or in its broadest reach, to proceeds traceable to unlawful activity. See *United States* v. *Parcel of Land, Rumson, N. J.*, 507 U. S. 111, 118–123 (1993); *The Palmyra*, 12 Wheat. 1, 14–15 (1827). Extending beyond contraband or its traceable proceeds, RICO mandates the forfeiture of property constituting the defendant's "interest in the racketeering enterprise" and property affording the violator a "source of influence" over the RICO enterprise. 18 U. S. C. § 1963(a) (1988 ed. and Supp. III). In a previous decision, we acknowledged the novelty of RICO's penalty scheme, stating that Congress passed RICO to provide "new weapons of unprecedented scope for an assault upon organized crime and its economic roots." *Russello* v. *United States*, 464 U. S. 16, 26 (1983).

As enacted in 1970, RICO targeted offenses then thought endemic to organized crime. 18 U. S. C. § 1961(1). When RICO was amended in 1984 to include obscenity as a predicate offense, there was no comment or debate in Congress on the First Amendment implications of the change. Act of Oct. 12, 1984, Pub. L. 98–473, 98 Stat. 2143. The consequence of adding a speech offense to a statutory scheme de-

unlawful debt collection in violation of section 1962." 18 U. S. C. §§ 1963(a)(1)–(3).

signed to curtail a different kind of criminal conduct went far beyond the imposition of severe penalties for obscenity offenses. The result was to render vulnerable to Government destruction any business daring to deal in sexually explicit materials. The unrestrained power of the forfeiture weapon was not lost on the Executive Branch, which was quick to see in the amended statute the means and opportunity to move against certain types of disfavored speech. The Attorney General's Commission on Pornography soon advocated the use of RICO and similar state statutes to "substantially handicap" or "eliminate" pornography businesses. 1 United States Dept. of Justice, Attorney General's Commission on Pornography, Final Report 498 (1986). As these comments illustrate, the constitutional concerns raised by a penalty of this destructive capacity are distinct from the concerns raised by traditional methods of punishment.

The Court says that, taken together, our decisions in *Fort Wayne Books* and *Arcara* v. *Cloud Books, Inc.*, 478 U. S. 697 (1986), dispose of petitioner's First Amendment argument. See *ante*, at 556–558. But while instructive, neither case is dispositive. In *Fort Wayne Books* we considered a state law patterned on the federal RICO statute, and upheld its scheme of using obscenity offenses as the predicate acts resulting in fines and jail terms of great severity. We recognized that the fear of severe penalties may result in some self-censorship by cautious booksellers, but concluded that this is a necessary consequence of conventional obscenity prohibitions. 489 U. S., at 60. In rejecting the argument that the fines and jail terms in *Fort Wayne Books* infringed upon First Amendment principles, we regarded the penalties as equivalent to a sentence enhancement for multiple obscenity violations, a remedy of accepted constitutional legitimacy. *Id.*, at 59–60. We did not consider in *Fort Wayne Books* the First Amendment implications of extensive penal forfeitures, including the official destruction of protected expression. Further, while *Fort Wayne Books* acknowledges that some

degree of self-censorship may be unavoidable in obscenity regulation, the alarming element of the forfeiture scheme here is the pervasive danger of government censorship, an issue, I submit, the Court does not confront.

In *Arcara*, we upheld against First Amendment challenge a criminal law requiring the temporary closure of an adult bookstore as a penal sanction for acts of prostitution occurring on the premises. We did not subject the closure penalty to First Amendment scrutiny even though the collateral consequence of its imposition would be to affect interests of traditional First Amendment concern. We said that such scrutiny was not required when a criminal penalty followed conduct "manifest[ing] absolutely no element of protected expression." 478 U. S., at 705. That the RICO prosecution of Alexander involved the targeting of a particular class of unlawful speech itself suffices to distinguish the instant case from *Arcara*. There can be little doubt that regulation and punishment of certain classes of unprotected speech have implications for other speech that is close to the proscribed line, speech which is entitled to the protections of the First Amendment. See *Speiser* v. *Randall*, 357 U. S. 513, 525 (1958). Further, a sanction requiring the temporary closure of a bookstore cannot be equated, as it is under the Court's unfortunate analysis, see *ante*, at 556–557, with a forfeiture punishment mandating its permanent destruction.

## B

The majority tries to occupy the high ground by assuming the role of the defender of the doctrine of prior restraint. It warns that we disparage the doctrine if we reason from it. But as an analysis of our prior restraint cases reveals, our application of the First Amendment has adjusted to meet new threats to speech. The First Amendment is a rule of substantive protection, not an artifice of categories. The admitted design and the overt purpose of the forfeiture in this case are to destroy an entire speech business and all its pro-

tected titles, thus depriving the public of access to lawful expression. This is restraint in more than theory. It is censorship all too real.

Relying on the distinction between prior restraints and subsequent punishments, *ante*, at 548, 553–554, the majority labels the forfeiture imposed here a punishment and dismisses any further debate over the constitutionality of the forfeiture penalty under the First Amendment. Our cases do recognize a distinction between prior restraints and subsequent punishments, but that distinction is neither so rigid nor so precise that it can bear the weight the Court places upon it to sustain the destruction of a speech business and its inventory as a punishment for past expression.

In its simple, most blatant form, a prior restraint is a law which requires submission of speech to an official who may grant or deny permission to utter or publish it based upon its contents. See *Staub* v. *City of Baxley*, 355 U. S. 313, 322 (1958); *Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495, 503 (1952); *A Quantity of Copies of Books* v. *Kansas*, 378 U. S. 205, 222 (1964) (Harlan, J., dissenting); see also M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4–14 (1984). In contrast are laws which punish speech or expression only after it has occurred and been found unlawful. See *Kingsley Books, Inc.* v. *Brown*, 354 U. S. 436, 440–442 (1957). While each mechanism, once imposed, may abridge speech in a direct way by suppressing it, or in an indirect way by chilling its dissemination, we have interpreted the First Amendment as providing greater protection from prior restraints than from subsequent punishments. See, *e. g., Arcara* v. *Cloud Books, Inc., supra*, at 705–706; *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546, 558–559 (1975); *Kingsley Books, Inc.* v. *Brown, supra*, at 440–442. In *Southeastern Promotions, Ltd.* v. *Conrad*, we explained that "[b]ehind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after*

they break the law than to throttle them and all others beforehand." 420 U. S., at 559.

It has been suggested that the distinction between prior restraints and subsequent punishments may have slight utility, see Nimmer, *supra*, § 4.04, at 4–18 to 4–25, for in a certain sense every criminal obscenity statute is a prior restraint because of the caution a speaker or bookseller must exercise to avoid its imposition. See *Vance* v. *Universal Amusement Co.*, 445 U. S. 308, 324 (1980) (WHITE, J., joined by REHNQUIST, J., dissenting); see also Jeffries, Rethinking Prior Restraint, 92 Yale L. J. 409, 437 (1982). To be sure, the term "prior restraint" is not self-defining. One problem, of course, is that some governmental actions may have the characteristics both of punishment and prior restraint. A historical example is the sentence imposed on Hugh Singleton in 1579 after he had enraged Elizabeth I by printing a certain tract. See F. Siebert, Freedom of the Press in England, 1476–1776, pp. 91–92 (1952). Singleton was condemned to lose his right hand, thus visiting upon him both a punishment and a disability encumbering all further printing. Though the sentence appears not to have been carried out, it illustrates that a prior restraint and a subsequent punishment may occur together. Despite the concurrent operation of the two kinds of prohibitions in some cases, the distinction between them persists in our law, and it is instructive here to inquire why this is so.

Early in our legal tradition the source of the distinction was the English common law, in particular the oft cited passage from William Blackstone's 18th-century Commentaries on the Laws of England. He observed as follows:

> "The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public: to forbid this, is to

destroy the freedom of the press: but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity." 4 W. Blackstone, Commentaries *151–*152.

The English law which Blackstone was compiling had come to distrust prior restraints, but with little accompanying condemnation of subsequent punishments. Part of the explanation for this lies in the circumstance that, in the centuries before Blackstone wrote, prior censorship, including licensing, was the means by which the Crown and the Parliament controlled speech and press. See Siebert, *supra*, at 56–63, 68–74. As those methods were the principal means used by government to control speech and press, it follows that an unyielding populace would devote its first efforts to avoiding or repealing restrictions in that form.

Even as Blackstone wrote, however, subsequent punishments were replacing the earlier censorship schemes as the mechanism for government control over disfavored speech in England. Whether Blackstone's apparent tolerance of subsequent punishments resulted from his acceptance of the English law as it then existed or his failure to grasp the potential threat these measures posed to liberty, or both, subsequent punishment in the broad sweep that he commented upon would be in flagrant violation of the principles of free speech and press that we have come to know and understand as being fundamental to our First Amendment freedoms. Indeed, in the beginning of our Republic, James Madison argued against the adoption of Blackstone's definition of free speech under the First Amendment. Said Madison: "[T]his idea of the freedom of the press can never be admitted to be the American idea of it" because a law inflicting penalties would have the same effect as a law authorizing a prior restraint. 6 Writings of James Madison 386 (G. Hunt ed. 1906).

The enactment of the alien and sedition laws early in our own history is an unhappy testament to the allure that re-

strictive measures have for governments tempted to control the speech and publications of their people. And our earliest cases tended to repeat the suggestion by Blackstone that prior restraints were the sole concern of First Amendment protections. See *Patterson* v. *Colorado ex rel. Attorney General of Colorado*, 205 U. S. 454, 462 (1907); *Robertson* v. *Baldwin*, 165 U. S. 275, 281 (1897). In time, however, the Court rejected the notion that First Amendment freedoms under our Constitution are coextensive with liberties available under the common law of England. See *Grosjean* v. *American Press Co.*, 297 U. S. 233, 248–249 (1936). From this came the conclusion that "[t]he protection of the First Amendment . . . is not limited to the Blackstonian idea that freedom of the press means only freedom from restraint prior to publication." *Chaplinsky* v. *New Hampshire*, 315 U. S. 568, 572, n. 3 (1942).

As our First Amendment law has developed, we have not confined the application of the prior restraint doctrine to its simpler forms, outright licensing or censorship before speech takes place. In considering governmental measures deviating from the classic form of a prior restraint yet posing many of the same dangers to First Amendment freedoms, we have extended prior restraint protection with some latitude, toward the end of declaring certain governmental actions to fall within the presumption of invalidity. This approach is evident in *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697 (1931), the leading case in which we invoked the prior restraint doctrine to invalidate a state injunctive decree.

In *Near*, a Minnesota statute authorized judicial proceedings to abate as a nuisance a " 'malicious, scandalous and defamatory newspaper, magazine or other periodical.' " *Id.*, at 701–702. In a suit brought by the attorney for Hennepin County it was established that Near had published articles in various editions of The Saturday Press in violation of the statutory standard. *Id.*, at 703–705. Citing the instance of these past unlawful publications, the court enjoined any fu-

ture violations of the state statute. *Id.*, at 705. In one sense the injunctive order, which paralleled the nuisance statute, did nothing more than announce the conditions under which some later punishment might be imposed, for one presumes that contempt could not be found until there was a further violation in contravention of the order. But in *Near* the publisher, because of past wrongs, was subjected to active state intervention for the control of future speech. We found that the scheme was a prior restraint because it embodied "the essence of censorship." *Id.*, at 713. This understanding is confirmed by our later decision in *Kingsley Books* v. *Brown,* where we said that it had been enough to condemn the injunction in *Near* that Minnesota had "empowered its courts to enjoin the dissemination of future issues of a publication because its past issues had been found offensive." 354 U. S., at 445.

Indeed the Court has been consistent in adopting a speech-protective definition of prior restraint when the state attempts to attack future speech in retribution for a speaker's past transgressions. See *Vance* v. *Universal Amusement Co.,* 445 U. S. 308 (1980) *(per curiam)* (invalidating as a prior restraint procedure authorizing state courts to abate as a nuisance an adult theater which had exhibited obscene films in the past because the effect of the procedure was to prevent future exhibitions of pictures not yet found to be obscene). It is a flat misreading of our precedents to declare as the majority does that the definition of a prior restraint includes only those measures which impose a "legal impediment," *ante*, at 551, on a speaker's ability to engage in future expressive activity. *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 70 (1963), best illustrates the point. There a state commission did nothing more than warn booksellers that certain titles could be obscene, implying that criminal prosecutions could follow if their warnings were not heeded. The commission had no formal enforcement powers, and failure to heed its warnings was not a criminal offense. Although

the commission could impose no legal impediment on a speaker's ability to engage in future expressive activity, we held that scheme was an impermissible "system of prior administrative restraints." *Ibid.* There we said: "We are not the first court to look through forms to the substance and recognize that informal censorship may sufficiently inhibit the circulation of publications to warrant injunctive relief." *Id.,* at 67. If mere warning against sale of certain materials was a prior restraint, I fail to see why the physical destruction of a speech enterprise and its protected inventory is not condemned by the same doctrinal principles.

One wonders what today's majority would have done if faced in *Near* with a novel argument to extend the traditional conception of the prior restraint doctrine. In view of the formalistic approach the Court advances today, the Court likely would have rejected Near's pleas on the theory that to accept his argument would be to "blur the line separating prior restraints from subsequent punishments to such a degree that it would be impossible to determine with any certainty whether a particular measure is a prior restraint or not." *Ante,* at 554. In so holding the Court would have ignored, as the Court does today, that the applicability of First Amendment analysis to a governmental action depends not alone upon the name by which the action is called, but upon its operation and effect on the suppression of speech. *Near, supra,* at 708 ("[T]he court has regard to substance and not to mere matters of form, and . . . in accordance with familiar principles . . . statute[s] must be tested by [their] operation and effect"). See also *Smith* v. *Daily Mail Publishing Co.,* 443 U. S. 97, 101 (1979) (the First Amendment's application to a civil or criminal sanction is not determined solely by whether that action is viewed "as a prior restraint or as a penal sanction"); *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S., at 552–553 (challenged action is "indistinguishable in its censoring effect" from official actions consistently identified as prior restraints); *Schneider* v. *State (Town*

*of Irvington)*, 308 U. S. 147, 161 (1939) ("In every case, therefore, where legislative abridgment of [First Amendment] rights is asserted, the courts should be astute to examine the effect of the challenged legislation").

The cited cases identify a progression in our First Amendment jurisprudence which results from a more fundamental principle. As governments try new ways to subvert essential freedoms, legal and constitutional systems respond by making more explicit the nature and the extent of the liberty in question. First in *Near*, and later in *Bantam Books* and *Vance*, we were faced with official action which did not fall within the traditional meaning of the term "prior restraint," yet posed many of the same censorship dangers. Our response was to hold that the doctrine not only includes licensing schemes requiring speech to be submitted to a censor for review prior to dissemination, but also encompasses injunctive systems which threaten or bar future speech based on some past infraction.

Although we consider today a new method of government control with unmistakable dangers of official censorship, the majority concludes that First Amendment freedoms are not endangered because forfeiture follows a lawful conviction for obscenity offenses. But this explanation does not suffice. The rights of free speech and press in their broad and legitimate sphere cannot be defeated by the simple expedient of punishing after in lieu of censoring before. See *Smith* v. *Daily Mail Publishing Co., supra*, at 101–102; *Thornhill* v. *Alabama*, 310 U. S. 88, 101–102 (1940). This is so because in some instances the operation and effect of a particular enforcement scheme, though not in the form of a traditional prior restraint, may be to raise the same concerns which inform all of our prior restraint cases: the evils of state censorship and the unacceptable chilling of protected speech.

The operation and effect of RICO's forfeiture remedies are different from a heavy fine or a severe jail sentence because

RICO's forfeiture provisions are different in purpose and kind from ordinary criminal sanctions. See *supra*, at 563–565. The Government's stated purpose under RICO, to destroy or incapacitate the offending enterprise, bears a striking resemblance to the motivation for the state nuisance statute the Court struck down as an impermissible prior restraint in *Near*. The purpose of the state statute in *Near* was "not punishment, in the ordinary sense, but suppression of the offending newspaper or periodical." 283 U. S., at 711. In the context of the First Amendment, it is quite odd indeed to apply a measure implemented not only to deter unlawful conduct by imposing punishment after violations, but to " 'incapacitate, and . . . directly to remove the corrupting influence from the channels of commerce.' " *Russello* v. *United States*, 464 U. S., at 28, quoting 116 Cong. Rec. 18955 (1970) (remarks of sponsor Sen. McClellan). The particular nature of Ferris Alexander's activities ought not blind the Court to what is at stake here. Under the principle the Court adopts, any bookstore or press enterprise could be forfeited as punishment for even a single obscenity conviction.

Assuming the constitutionality of the mandatory forfeiture under § 1963 when applied to nonspeech-related conduct, the constitutional analysis must be different when that remedy is imposed for violations of the federal obscenity laws. "Our decisions furnish examples of legal devices and doctrines, in most applications consistent with the Constitution, which cannot be applied in settings where they have the collateral effect of inhibiting the freedom of expression." *Smith* v. *California*, 361 U. S. 147, 150–151 (1959). The regulation of obscenity, often separated from protected expression only by a "dim and uncertain line," must be accomplished through "procedures that will ensure against the curtailment of constitutionally protected expression." *Bantam Books* v. *Sullivan*, 372 U. S., at 66. Because freedoms of expression are "vulnerable to gravely damaging yet barely visible encroach-

ments," *ibid.*, the government must use measures that are sensitive to First Amendment concerns in its task of regulating or punishing speech. *Speiser* v. *Randall,* 357 U. S., at 525.

Whatever one might label the RICO forfeiture provisions at issue in this case, be it effective, innovative, or Draconian, § 1963 was not designed for sensitive and exacting application. What is happening here is simple: Books and films are condemned and destroyed not for their own content but for the content of their owner's prior speech. Our law does not permit the government to burden future speech for this sort of taint. Section 1963 requires trial courts to forfeit not only the unlawful items and any proceeds from their sale, but also the defendant's entire interest in the enterprise involved in the RICO violations and any assets affording the defendant a source of influence over the enterprise. 18 U. S. C. §§ 1963(a)(1)–(3) (1988 ed. and Supp. III). A defendant's exposure to this massive penalty is grounded on the commission of just two or more related obscenity offenses committed within a 10-year period. Aptly described, RICO's forfeiture provisions "arm prosecutors not with scalpels to excise obscene portions of an adult bookstore's inventory but with sickles to mow down the entire undesired use." *Fort Wayne Books,* 489 U. S., at 85 (STEVENS, J., concurring in part and dissenting in part).

What is at work in this case is not the power to punish an individual for his past transgressions but the authority to suppress a particular class of disfavored speech. The forfeiture provisions accomplish this in a direct way by seizing speech presumed to be protected along with the instruments of its dissemination, and in an indirect way by threatening all who engage in the business of distributing adult or sexually explicit materials with the same disabling measures. Cf. *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations,* 413 U. S. 376, 390 (1973) (the special vice of the prior restraint is suppression of speech, either directly or by in-

ducing caution in the speaker, prior to a determination that the targeted speech is unprotected by the First Amendment).

In a society committed to freedom of thought, inquiry, and discussion without interference or guidance from the state, public confidence in the institutions devoted to the dissemination of written matter and films is essential. That confidence erodes if it is perceived that speakers and the press are vulnerable for all of their expression based on some errant expression in the past. Independence of speech and press can be just as compromised by the threat of official intervention as by the fact of it. See *Bantam Books, Inc.* v. *Sullivan, supra,* at 70. Though perhaps not in the form of a classic prior restraint, the application of the forfeiture statute here bears its censorial cast.

*Arcara* recognized, as the Court today does not, the vital difference between a punishment imposed for a speech offense and a punishment imposed for some other crime. Where the government seeks forfeiture of a bookstore because of its owner's drug offenses, there is little reason to surmise, absent evidence of selective prosecution, that abolishing the bookstore is related to the government's disfavor of the publication outlet or its activities. Where, however, RICO forfeiture stems from a previous speech offense, the punishment serves not only the Government's interest in purging organized-crime taint, but also its interest in deterring the activities of the speech-related business itself. The threat of a censorial motive and of ongoing speech supervision by the state justifies the imposition of First Amendment protection. Free speech principles, well established by our cases, require in this case that the forfeiture of the inventory and of the speech distribution facilities be held invalid.

The distinct concern raised by § 1963 forfeiture penalties is not a proportionality concern; all punishments are subject to analysis for proportionality and this concern should be addressed under the Eighth Amendment. See *Austin* v.

*United States, post,* p. 602. Here, the question is whether, when imposed as punishment for violation of the federal obscenity laws, the operation of RICO's forfeiture provisions is an exercise of Government censorship and control over protected speech as condemned in our prior restraint cases. In my view the effect is just that. For this reason I would invalidate those portions of the judgment which mandated the forfeiture of petitioner's business enterprise and inventory, as well as all property affording him a source of influence over that enterprise.

## II

Quite apart from the direct bearing that our prior restraint cases have on the entire forfeiture that was ordered in this case, the destruction of books and films that were not obscene and not adjudged to be so is a remedy with no parallel in our cases. The majority says that our cases "establish quite clearly that the First Amendment does not prohibit . . . forfeiture of expressive materials as punishment for criminal conduct." See *ante,* at 555. But the single case cited in support of this stark new threat to all speech enterprises is *Arcara* v. *Cloud Books, Inc. Arcara,* as discussed, *supra,* at 565, is quite inapposite. There we found unconvincing the argument that protected bookselling activities were burdened by the closure, saying that the owners "remain free to sell [and the public remains free to acquire] the same materials at another location." 478 U. S., at 705. Alexander and the public do not have those choices here for a simple reason: The Government has destroyed the inventory. Further, the sanction in *Arcara* did not involve a complete confiscation or destruction of protected expression as did the forfeiture in this case. Here the inventory forfeited consisted of hundreds of original titles and thousands of copies, all of which are presumed to be protected speech. In fact, some of the materials seized were the very ones the jury here determined not to be obscene. Even so, all of the inventory was seized and destroyed.

Even when interim pretrial seizures are used, we have been careful to say that First Amendment materials cannot be taken out of circulation until they have been determined to be unlawful. "[W]hile the general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause . . . , it is otherwise when materials presumptively protected by the First Amendment are involved." *Fort Wayne Books,* 489 U. S., at 63. See *id.,* at 65–66; *Lo-Ji Sales, Inc.* v. *New York,* 442 U. S. 319, 326, n. 5 (1979) (the First Amendment imposes special constraints on searches for, and seizures of, presumptively protected materials).

In *Marcus* v. *Search Warrant,* 367 U. S. 717, 731–733 (1961), we invalidated a mass pretrial seizure of allegedly obscene publications achieved through a warrant that was vague and unspecific. The constitutional defect there was that the seizure was imposed without safeguards necessary to assure nonobscene material the constitutional protection to which it is entitled. In similar fashion we invalidated, in *A Quantity of Copies of Books* v. *Kansas,* 378 U. S., at 211–213, a state procedure authorizing seizure of books alleged to be obscene prior to hearing, even though the system involved judicial examination of some of the seized titles. While the force behind the special protection accorded searches for and seizures of First Amendment materials is the risk of prior restraint, see *Maryland* v. *Macon,* 472 U. S. 463, 470 (1985), in substance the rule prevents seizure and destruction of expressive materials in circumstances such as are presented in this case without an adjudication of their unlawful character.

It follows from the search cases in which the First Amendment required exacting protection, that one title does not become seizable or tainted because of its proximity on the shelf to another. And if that is the rule for interim seizures, it follows with even greater force that protected materials cannot be destroyed altogether for some alleged taint from an owner who committed a speech violation. In attempting

to distinguish the holdings of *Marcus* and *A Quantity of Books*, the Court describes the constitutional infirmity in those cases as follows: "[T]he government had seized or otherwise restrained materials suspected of being obscene without a prior judicial determination that they were in fact so." *Ante*, at 551. But the same constitutional defect is present in the case before us today, and the Court fails to explain why it is not fatal to the forfeiture punishment here under review. Thus, while in the past we invalidated seizures which resulted in a temporary removal of presumptively protected materials from circulation, today the Court approves of Government measures having the same permanent effect. In my view, the forfeiture of expressive material here that had not been adjudged to be obscene, or otherwise without the protection of the First Amendment, was unconstitutional.

\* \* \*

Given the Court's principal holding, I can interpose no objection to remanding the case for further consideration under the Eighth Amendment. But it is unnecessary to reach the Eighth Amendment question. The Court's failure to reverse this flagrant violation of the right of free speech and expression is a deplorable abandonment of fundamental First Amendment principles. I dissent from the judgment and from the opinion of the Court.