[Cite as *In re C.D.*, 2021-Ohio-639.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

IN RE:

    C.D.,

CASE NO.  17-20-11

ADJUDGED NEGLECTED CHILD.

**O P I N I O N**

[JOHN W. - APPELLANT]


**Appeal from Shelby County Common Pleas Court**
**Juvenile Division**
**Trial Court No. 2018 NEG 0021**

**Judgment Affirmed**

**Date of Decision:  March 8, 2021**


**APPEARANCES:**

    *F. Stephen Chamberlain* **for Appellant**

    *Madison S. Brinkman* **for Appellee**

**SHAW, J.**

{¶1} Father-appellant, John W. ("John"), brings this appeal from the August 26, 2020 judgment of the Shelby County Common Pleas Court, Juvenile Division, granting permanent custody of the minor child C.D. to the Shelby County Department of Job and Family Services, Children Services Division ("the Agency"). On appeal, John argues that the trial court erred by denying him the ability to testify at the permanent custody hearing via electronic means, and that the trial court erred by ordering John, and other parties to the case, to refrain from posting about the case on social media.

*Background*

{¶2} C.D. was born in August of 2009. In April of 2018, he was living with his mother, Carol, and his younger sister, Ch.B., in Sidney Ohio. C.D.'s father, John, lived in Florida.[1] John was not the father of Ch.B.[2]

{¶3} The record indicates that on April 4, 2018, the Agency received a report regarding C.D. and Ch.B. The reporting source told the Agency that C.D. arrived at school with bright red lines all the way around his neck, bruises on his collar bone, and scratches on his elbow and ankle. C.D. told a caseworker that his neck was hurting and that he thought that it might be from fleas or bed bugs. In addition,

---

[1] According to John, Carol absconded with C.D. from Florida and John did not know where they went until this case was filed.
[2] Ch.B. is not part of this appeal and we will mention her only where relevant.

C.D. told a caseworker that he and his younger sister had been left alone overnight, that it happened almost every night, and that it scared him.

{¶4} While visiting the children's school to investigate the matter, the Agency received reports that Carol, and other adults in her home, were using methamphetamines. Afterward, an officer and a caseworker for the Agency attempted to conduct a home visit at Carol's residence. They made contact with Carol, but Carol refused to take a drug screen and she refused to let the caseworker or the officer inside, stating that the home was infested with bed bugs. The officer and the caseworker thought Carol was "jittery" and "unfocused." They suspected Carol was under the influence at the time.

{¶5} Another visit to Carol's home was conducted May 18, 2018. At that time, a man named Tony answered the door. Tony admitted that Carol used drugs, but stated that he was the primary caregiver for the children and that he did not use drugs. Tony took a drug screen at that time and passed. However, two days later Tony was arrested and charged with burglary. Following his arrest, Tony tested positive for methamphetamines.

{¶6} On May 21, 2018, the Agency received another referral concerning the welfare of the children. The Agency was informed that the children were being taken in and out of a drug house. The Agency was also informed that Carol and her

friends were using meth while the children were in Carol's care. The condition of Carol's residence was said to be deplorable.

{¶7} After receiving the new reports, on the night of May 21, 2018, the Sidney Police conducted a wellness-check at Carol's residence. At that time a known drug user was present at Carol's residence and the home was "filthy" and "infested with bed bugs." (Doc. No. 73). The home was "dangerously cluttered in certain areas and littered [with] bags of trash and/or dirty clothes and dirty dishes." (*Id*.) In fact, the officers could not open the door to the children's bedroom all the way due to the clutter. The officers told the Agency that no child should be living in that residence.

{¶8} On May 22, 2018, a complaint was filed alleging that C.D. was a neglected child pursuant to R.C. 2151.03(A)(2). Following a shelter care hearing, C.D. was placed in the temporary custody of the Agency.

{¶9} John was eventually served with the complaint in Florida. After being served, John filed a handwritten letter with the trial court indicating that he had received service, that he was disabled, and that he could not afford an attorney because he was waiting on back-pay from social security. An attorney was appointed for John.

{¶10} The matter proceeded to an adjudication hearing on June 8, 2018. John was not present for the hearing. Testimony at the hearing echoed what had been

previously alleged regarding the children's living conditions at Carol's residence and Carol's drug problem.[3]  In addition, there was testimony from witnesses who identified problems with the children's health and wellness, significant problems with the children's school attendance, and problems with Carol leaving the children alone overnight while she was off with others.  The trial court filed a detailed entry on the matter adjudicating C.D. and Ch.B. neglected as alleged in the complaint. The children were placed in the temporary custody of the Agency.

{¶11} As the case proceeded, Carol was not cooperative with meeting Agency staff or seeing C.D.  In fact, Carol did not visit with C.D. after his removal from her care in May of 2018.  Her whereabouts were mostly unknown throughout the pendency of the case.

{¶12} In June of 2019, C.D.'s sister, Ch.B., was placed into the legal custody of her paternal grandmother.  Meanwhile, the Agency explored numerous relative placement options for C.D.  John was one of several of the placement options for C.D. that the Agency explored.  In fact, John eventually filed a motion for legal custody of C.D.  Notably, since John lived in Florida, and he did not have the financial means to travel regularly, he was only having contact with C.D. via the phone approximately once every three weeks.

---

[3] We do not have a transcript of the adjudication hearing; however, the trial court thoroughly summarized the testimony in an entry on the matter.

{¶13} Through the interstate compact, John's home was studied to determine if C.D.'s legal placement with John would be a viable option. Ultimately John was rejected as a viable candidate for placement. John's live-in paramour was statutorily disqualified due to having a felony conviction in 2015. The paramour was also the only individual receiving an income at the time, as John received food stamps but no social security benefits. The GAL cited this as a reason that should the paramour move out, John would not be able to provide for C.D.

{¶14} Despite the fact that the interstate compact rejected John as a possible placement, the trial court reviewed John's request for legal custody of C.D. at a hearing, analyzing all of the information presented. Ultimately the trial court found that legal placement of C.D. with John was not appropriate. In addition to the rejection by the out-of-state home study, the trial court stated as follows.

> **[T]he Agency outlined a significant history of criminal offenses and legal problems of the father including aggravated battery, DUI, probation violations, and a past warrant for his arrest. John * * * has also been involved as a witness or victim in various criminal and inappropriate matters as reported by the Gainesville Florida Sheriff's Department. He has had certain mental health and psychological problems as a result, in part, of a homicide in which he was involved. Overall he did not credibly demonstrate to this Court that he is personally able to handle the custodial needs of C.D. at this time. The Court also questions his judgment in his attempt to use this case and the child's name to raise funds on the internet during the pendency of these proceedings, resulting in the agreed Order/Entry of this Court on January 31, 2019 prohibiting such conduct. The Court finds that such behavior is not to be in the best interest of the child. Overall, the Court finds the testimony and concerns of the Agency and the**

**report and testimony of the Guardian Ad Litem credible and well-taken. When compared to the child's success in foster care the Court finds that placement of legal custody with the father is not in the child's best interest.**

(Doc. No. 175).[4]

---

[4] John would later file a letter with the trial court disputing some of the trial court's findings, particularly with regard to his prior convictions. For instance, John's letter disputes having a "battery" charge, then states as follows.

**I was put on probation in 2015 for defending myself as Document #3 shows. I had my machete and shopping cart with me so I could cut and gather firewood.**

**A man tried to attack me with a large branch so I defended myself. Ajudification [sic] was withheld, meaning I wasn't convicted. To this day, the only thing I have been convicted of was Driving on a Suspended license in 2002.**

**I am an Election Clerk for precinct 47 in Alachua County. Proof once again I'm not a convicted felon…A convicted felon cannot hold a county position according to the Elections Bureau.**

**#3 Yes, I had to kill a good friend of mine in 2007. The State of Florida did not charge me with a homicide it was self defense. It was the "Stand Your Ground law". Plus, I found two people dead over the years in my neighborhood. Once again, I wasn't involved in any homicides, I was the unfortunate person who found those people.**

**Yes, I went to therapy to deal with these horrific incidents. You seem to think that makes me an unfit parent. However, Barb R[.] said seeking therapy made me a better person for realizing I needed help and getting it.**

**\* \* \*** [John disputes his paramour's conviction in the letter for multiple paragraphs] **\* \* \***

**You mentioned I made a poor judgment choice when I started a Go Fund [sic] account. I merely used legal means to try to raise money for court in Ohio the first time. The only reason I started the fund was to help with finances because the trip was so short noticed. However, as the State of Florida stated we have the money to raise [C.D.] and we ended up paying for my trips to Ohio. Poor judgment would have been doing something illegal to get the money or just not go to Ohio at all.**

**I have been talking to my son, [C.D.], every three weeks. I have been involved in [Agency] conference calls concerning [C.D.] and what's happening with him. I don't understand how or why I am being called an unfit parent I never had a chance to be a parent, a father.**

**I would like to request that if and when [foster mother] adopts my son that I don't lose contact with him. It would be nice to be able to talk to [C.D.] twice a month, at least, and holidays and his birthdays. \* \* \***

{¶15} Following the denial of John's motion for legal custody, the Agency continued to exhaust all possible relative placement options for C.D. After being unsuccessful, the Agency filed for permanent custody of C.D. on August 6, 2019; however, John eventually identified another possible relative placement for C.D. in Rhode Island. The Agency dismissed its original permanent custody motion to allow time for a home study to be done of John's relative. After this home study revealed that John's relative would be unable to care for C.D., the Agency again filed for permanent custody.

{¶16} A permanent custody hearing was held August 7, 2020. At the hearing, the trial court heard testimony of Carol's abandonment of C.D. and her lack of involvement with the case plan. The trial court heard testimony regarding the Agency's efforts to place C.D. with various relatives, including John.[5] The trial court heard testimony regarding John's financial and health issues, the trial court heard testimony of C.D. thriving in his placement, and the trial court heard testimony of C.D.'s bond with his foster family. The GAL also recommended that the Agency's motion for permanent custody be granted.

---

(Doc. No. 237).
[5] Throughout this case C.D.'s maternal grandmother fought for custody of C.D. Her claim was rejected by the trial court for multiple reasons. There was a significant amount of testimony regarding C.D.'s maternal grandmother; however, this appeal does not involve maternal grandmother therefore we will not address the arguments and claims she made to the trial court. The trial court thoroughly addressed this matter in the first instance.

{¶17} After hearing the testimony, the trial court determined, by clear and convincing evidence, that C.D. had been in the care of the Agency for 12 or more months of a consecutive 22 month period, and that it was in C.D.'s best interests for the Agency's permanent custody motion to be granted. A judgment entry terminating John's parental rights with respect to C.D. was filed August 26, 2020. It is from this judgment that John appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**The trial court committed error that was prejudicial to the appellant father by denying him his due process rights in failing to allow his testimony [through] participation via electronic means of telephone or internet.**

**Assignment of Error No. 2**
**The trial court committed error prejudicial to the appellant/father in [preventing] him (and other parties) from posting matters regarding the case on social media in violation of the First and Fourteenth Amendments of the United States Constitution.**

*First Assignment of Error*

{¶18} In his first assignment of error, John argues that the trial court denied him his due process rights. More specifically, John contends that the trial court erred by denying him the ability to attend the entire permanent custody hearing via video, and to testify via video.

Standard of Review

{¶19} Generally, "We review a trial court's decision on whether to allow telephone or video testimony for an abuse of discretion." *Hise v. Laiviera*, 7th Dist. Monroe No. 18 MO 0010, 2018-Ohio-5399, ¶ 29, citing *Miklas v. Miklas*, 7th Dist. Belmont No.14 BE 46, 2015-Ohio-3829, at ¶ 12. A trial court abuses its discretion when its decision is arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶20} However, John claims that the trial court actually violated his right to procedural due process in this case. "The right to procedural due process is found in the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution." *Youngstown v. Traylor*, 123 Ohio St.3d 132, 2009-Ohio-4184, ¶ 8; *State v. Hayden,* 96 Ohio St.3d 211, 2002-Ohio-4169, ¶ 6. "Although the concept is flexible, at its core, procedural due process under both the Ohio and United States Constitutions requires, at a minimum, an opportunity to be heard when the state seeks to infringe a protected liberty or property right." *State v. Cowan,* 103 Ohio St.3d 144, 2004-Ohio-4777, ¶ 8, citing *Boddie v. Connecticut*, 401 U.S. 371, 377, 91 S.Ct. 780 (1971).

Analysis

{¶21} The permanent custody hearing in this case was scheduled for August 7, 2020, and the parties were properly apprised of this date. Three days before the final hearing, on August 4, 2020, John filed a notice with the trial court that he

wished to fire his attorney. The letter also indicated John wished to attend the permanent custody hearing through telephonic means.

{¶22} John's letter was discussed at the beginning of the permanent custody hearing during the following dialogue.

> **THE COURT: \* \* \* A couple preliminary things for the record. The Court did receive a request for [John] regarding some concerns regarding, Mr. Gudgel, your representation and his concern about being available – being able to attend by video.**
>
> **And I know you know this, but as a matter of how this works, this Court does not have the kind of system that would allow a participant to attend by video the entire time, and so we don't find that reliable.**
>
> **In addition, we don't even know if he has the reliable technology to experiment with during the day to do that so just for the record that issue simply would've been denied.**
>
> **So what I need to know for you today are you, are you and your client otherwise prepared to proceed?**
>
> **MR. GUDGEL: Yes, Your Honor.**
>
> **THE COURT: All right. I do note, and I have agreed, that he can – this is kind of unusual, but I've allowed you to have your phone on with him present on the other end so he can hear what is going on.**
>
> **Please understand that that does not mean he'll be able to testify from his phone or be involved in anything other than listening.**
>
> **And my understanding from you is that is acceptable to you and your client; is that correct?**
>
> **MR. GUDGEL: Yes, Your Honor.**

**THE COURT:  Okay.  And your client is prepared to proceed with your representation; is that correct?**

**MR. GUDGEL:  Yes.**

**THE COURT:  All right.  Well, the Court's going to then overrule the – based upon the agreement between you and your client, the Court is going to proceed today with you representing him in this court.**

**Also, the request was made by the State for a witness to testify by video, and although we are – we would like to try to accommodate that, mostly for the reasons I've already stated, we really are not able to do that.**

**And the reason for the request made sense because my understanding is there was some COVID exposure situations, and they prefer not to be here.  And, and if I'm correct, based upon our in-chamber discussion before we came into the courtroom, the State is prepared to proceed without that witness; is that correct?**

**MS. BRINKMAN:  That is correct, Your Honor.**

(Tr. at 6-8).

{¶23} In addition to the discussion on the record prior to the permanent custody hearing, the trial court also addressed John's letter in its final judgment entry, stating as follows.

**On August 4, 2020 John * * * filed a request for new counsel and an opportunity to attend the hearing by video.  That request was considered prior to hearing on August 7, 2020 whereupon John * * * agreed to the continued representation of his counsel and that he would be satisfied listening to the proceedings by cellular speaker phone.  Based upon that agreement, the Court proceeded.**

(Doc. 294).

**{¶24}** After reviewing the record, it is important to emphasize that John never specifically expressed a desire to actually *testify* at the permanent custody hearing, regardless of what he claims on appeal. He expressed a desire to be present for the hearing, or to "attend" the hearing, and to have representation, but there was no indication from the dialogue prior to the hearing, through John's letter to the trial court, or through any of John's attorney's statements throughout the hearing that John actually wanted to "testify" as he claims on appeal. In fact, John's attorney rested his case without calling any witnesses and John's attorney did not state at that time that John wished to testify if he was able. Further, John's attorney affirmatively indicated to the trial court that having John listen to the testimony through his phone was acceptable to John, *without any reservations on the record.*

**{¶25}** Given that the trial court had already denied John's motion for legal custody through an entry following a prior hearing on the matter, and given that John had been rejected as a placement option, it is unclear how much his testimony could have added to the permanent custody situation that was actually before the trial court. This is particularly true given that John was only talking to C.D. once every three weeks for a single hour.

**{¶26}** Regardless, as to John's claims regarding procedural due process, John was provided ample notice of the permanent custody hearing and he had the

opportunity to be heard. He was able to attend the hearing audibly through his attorney's phone, and he was represented by his attorney at the hearing. John's attorney cross-examined witnesses and asked about John's involvement with the Agency throughout the pendency of the case. The Agency even admitted that John was present for most team meeting phone calls regarding C.D. We do not see any denial of due process here at the permanent custody hearing where John had notice and an opportunity to be heard. He only made a request to appear remotely just days prior to the permanent custody hearing. Surely, being in Florida John would have known that he had not made travel plans to come to Ohio for the scheduled hearing prior to that occasion.

{¶27} Moreover, as to John's claims on appeal that the trial court erred by denying him the ability to "testify,"—despite no indication that John actually wished to testify, which would subject him to cross-examination—this is a discretionary matter for the trial court under Juv.R. 41, which reads as follows.

> **At trial or hearing, the witnesses' testimony shall be taken in open court unless a statute, the Rules of Evidence, these rules, or other rules adopted by the Supreme Court provide otherwise. In all juvenile matters, except adjudicatory hearings in delinquency, unruly, and juvenile traffic cases and adult criminal trials, the juvenile court, with appropriate safeguards, may permit testimony in open court by contemporaneous transmission from a different location either with the agreement of the parties or for good cause shown.**

{¶28} When looking at the trial court's discretion under Juv.R. 41 in this case, the trial court indicated that it did not have the technical capability to allow John to *attend* the entire hearing through electronic means. There was no discussion on the record of John attempting to testify. Nevertheless, even assuming that the trial court did deny John an attempt at "testifying," the trial court showed that its decision was not arbitrary by denying the State the opportunity to present the testimony of one of its own witnesses through electronic means. There is simply no indication in the record that John was denied any rights in this case, or that the trial court's decision was, in any manner, arbitrary.

{¶29} Based on the record before us, we cannot find that John was denied any due process rights, or that the trial court erred by "denying" him the ability to "testify" via video, especially when he never specifically made such a request. Therefore, his first assignment of error is overruled.

*Second Assignment of Error*

{¶30} In John's second assignment of error, he argues that the trial court violated his First Amendment rights by ordering that the parties could not post about these proceedings on social media.

The First Amendment

{¶31} The First Amendment to the United States Constitution provides in part that "Congress shall make no law * * * abridging the freedom of speech." "

'[T]he Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States * * *.' " *Bey v. Rasawehr*, 161 Ohio St.3d 79, 2020-Ohio-3301, ¶ 19, quoting *Manhattan Community Access Corp. v. Halleck*, —— U.S. ——, 139 S.Ct. 1921, 1928, 204 L.Ed.2d 405 (2019).

{¶32} " '[A]s a general matter, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." ' " *Bey* at ¶ 20 quoting *Ashcroft v. Am. Civil Liberties Union,* 535 U.S. 564, 573, 122 S.Ct. 1700 (2002), quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 65, 103 S.Ct. 2875 (1983), quoting *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286 (1972). "The right to free speech secured by the First Amendment is not absolute, however, and the government may regulate it in a manner that is consistent with the Constitution." *Bey* at ¶ 21, citing *Virginia v. Black,* 538 U.S. 343, 358, 123 S.Ct. 1536 (2003).

{¶33} "A regulation of speech that is content-based is presumptively unconstitutional and is subject to strict scrutiny, which requires that it be the least restrictive means to achieve a compelling state interest." *Id*. at ¶ 22 citing *Reed v. Gilbert,* 576 U.S. 155, 135 S.Ct. 2218, 2226-2227 (2015). However, "Content-neutral regulations limiting the time, place, and manner of speech are constitutional as long as they promote 'important governmental interests unrelated to the suppression of free speech, and do[ ] not burden substantially more speech than

necessary to further those interests.' " *Id*. at ¶ 23, quoting *Turner Broadcasting Sys., Inc. v. Fed. Communications Comm.,* 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997), syllabus.

{¶34} "The term 'prior restraint' is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.' " (Emphasis added in *Alexander*.) *Alexander v. United States,* 509 U.S. 544, 550, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993), quoting Nimmer, *Nimmer on Freedom of Speech*, Section 4.03, at 4-14 (1984). A prior restraint is not unconstitutional per se but bears " 'a heavy presumption against its constitutional validity.' " *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

{¶35} In *Bey v. Rasawehr,* 161 Ohio St.39 79, 2020-Ohio-3301, ¶ 27, the Supreme Court of Ohio stated,

> **The fact that expression may now occur in "cyberspace—the 'vast democratic forums of the Internet' in general,** *Reno v. Am. Civ. Liberties Union***, 521 U.S. 844, 868, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), and social media in particular,"** *Packingham v. North Carolina,* **—— U.S. ——, 137 S.Ct. 1730, 1735, 198 L.Ed.2d 273 (2017), does not mean that governmental regulation of that speech is beyond the reach of First Amendment analysis and scrutiny.** *See Packingham* **at 1735-1737 (invalidating a North Carolina statute that prohibited registered sex offenders from accessing commercial social-networking websites);** *see also Toledo Blade Co.***, 125 Ohio St.3d 149, 2010-Ohio-1533, 926 N.E.2d 634, at ¶ 25, quoting** *Citizens United v. Fed. Election*

***Comm.*, 558 U.S. 310, 326, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (notwithstanding the emergence of "revolutionary changes in the delivery of information to the public" through the Internet and other forms of mass communication, " '[c]ourts, too, are bound by the First Amendment * * * [and] [w]e [must] decline to draw, and then redraw, constitutional lines based on the particular media or technology used' ").**

Analysis

**{¶36}** Several months after John filed his motion for legal custody of C.D. in this case, a motion was filed to prohibit John from "using the minor child C.D. to make a 'Go Fund Me' page on Facebook." (Doc. No. 112). A hearing was held on the matter, though we have no transcript from that hearing. Nevertheless, as a result of what transpired at the hearing, the trial court issued an entry that reads, in pertinent part, as follows.

> **Based upon the request, the agreement of the parties, and the best interest of the minor child, it is hereby ORDERED, ADJUDGED and DECREED that all parties are hereby prohibited from using the minor child, C.D. to make a "Go Fund Me" page on Facebook or to use the child's picture or to make any reference to this case on any type of social media.**

(Doc. No. 120). The entry also indicates that John gave his approval to his attorney regarding the agreement over the phone, and that John's attorney was present for the hearing.

**{¶37}** Based on the only documents in the record before us, the trial court's entry appears to indicate that John was *in agreement* with not posting about C.D. on social media or using C.D. to make a "Go Fund Me" page. John now claims that

-18-

the "Go Fund Me" page was to help him attend hearings and be involved in this case and that the "trial court's restriction" violated his First Amendment rights. However, making an agreement on this matter and then raising it as an error on appeal would seem to fall into a category of invited error. *See Gilson v. Am. Inst. Of Alternative Medicine*, 10th Dist. Franklin No. 15AP-548, 2016-Ohio-1324, ¶ 108. Since John agreed to the restriction regarding the "Go Fund Me" page, we fail to see how there is a violation of his First Amendment rights here.[6]

{¶38} Notwithstanding this point, as the State suggests in its brief, juvenile cases, particularly those regarding abused, neglected, and dependent children, contain a need for confidentiality. *In re T.R.*, 52 Ohio St.3d 6, 16 (1990). Given the focus in juvenile proceedings on the best interests of the children, a juvenile court would have some inherent authority to protect the confidentiality of the child for the child's welfare. This is reflected in R.C. 2151.359(A)(1), which establishes that in a proceeding wherein a child has been adjudicated, *inter alia*, neglected, a trial court may make an order "restraining or otherwise controlling the conduct of any parent, * * * if the court finds that an order of that type is necessary to * * * [c]ontrol any conduct or relationship that will be detrimental or harmful to the

---

[6] Notably, John was not prevented from making a "Go Fund Me" page without referencing the juvenile court proceedings.

child[;] [or] [c]ontrol any conduct or relationship that will tend to defeat the execution of the order of disposition made or to be made."[7]

{¶39} Based on John's agreement at the hearing on the matter through his attorney, a juvenile court's authority to control a party's conduct that will be detrimental to the child, and the need for confidentiality in juvenile cases, we cannot find a violation of John's First Amendment rights on the "Go Fund Me" issue.

{¶40} John next argues that the trial court erred by making a similar order restricting posts on social media later during the pending case. He contends the trial court's second order also violated his First Amendment rights.

{¶41} The second issue regarding social media posts began in May of 2019, when a motion was filed to "prohibit parties from posting information regarding children's court proceedings on social media accounts." (Doc. No. 164). This motion alleged that the father of Ch.B., *not* John, had been posting information *regarding Ch.B.'s case* and the alleged trial testimony from *Ch.B.'s case* on his Facebook account. Exhibits were attached to the motion, containing the referenced Facebook posts.[8] Importantly, none of the referenced posts were made by John, or were in reference to C.D.

---

[7] This is also reflected, to an extent, in the juvenile rules as there are rules that allow the juvenile court to restrain or control the conduct of any party that would not be in the best interest of a child. *See* Juv.R. 13(B)(2)(g) (stating that pending a hearing on the *complaint*—a much earlier stage in the proceeding—a trial court may make orders restraining or controlling a party's conduct).

[8] One of those posts read, in pertinent part, as follows.

{¶42} A hearing was held on the motion to prevent the parties from posting about this case on social media wherein John's attorney was present. The trial court was made aware of the Facebook postings of *Ch.B.'s father*. Following the hearing, the trial court issued an entry, ordering "that the parties are prohibited from posting information regarding children's court proceedings on social media accounts, and orders all parties to remove any and all social media postings regarding these proceedings." (Doc. No. 174).

{¶43} On appeal, John argues that the trial court's second order violates his First Amendment rights, stating that the "sweeping orders" failed to balance First Amendment protections with privacy of C.D.. Notably, the trial court's order did refer to "all parties," but it was clearly in reference primarily to the actions of the father of Ch.B. We actually have no indication that this order required *John* to take down any previously created social media postings. Further, there is no indication in the record before us that John objected to this order.

{¶44} However, to the extent that the trial court's order did "restrict" John's First Amendment rights, the order only prohibited him from speaking about C.D.'s

---

**My mother got on the stand and lied her ass off in an attempt to get my daughter. My mother claims she's afraid I will hurt my daughter or molester [sic] her. [Y]et my mother is the one who repeatedly sent her children to a child molester when they were little and they begged not to go. [Named individual not relevant to C.D.'s case] was convicted of child molestation, child sodomy, and child [pornography], he spent 12 years in prison in the state of Minnesota for his crimes. [A]nd this is the man my mother repeatedly sent her children to time and time again when they begged her not to.**

(*Id*. at Ex. A).

*court proceedings* on social media accounts. John was not prevented from talking about C.D. in general on his social media accounts, thus the order appears narrowly tailored in this instance to protect a significant interest, that being the confidentiality of C.D. It also seems to fall within the ambit of the juvenile court's powers under R.C. 2151.359, as previously stated.

{¶45} Moreover, this case is highly distinguishable from a much broader restriction on social media postings that the Supreme Court of Ohio recently rejected under the First Amendment in *Bey v. Rasawehr*, 2020-Ohio-3301. In *Bey*, the trial court restricted an individual from posting "anything" about an opposing party on social media as part of a civil-stalking protection order. *Bey* at ¶ 51. The Supreme Court of Ohio found this restriction overbroad.

{¶46} Importantly, however, the opposing party in the *Bey* case was not a child and the case did not involve neglect or permanent custody. Even assuming this case involves a content-based restriction like *Bey*, we do not find that the restriction here is in the same category of restrictions as those rejected in *Bey*, particularly given the heightened standard of confidentiality regarding children in neglect proceedings. *See In re T.R.*, 52 Ohio St.3d 6, 16 (1990).

{¶47} In sum, based on the specific facts and circumstances of this case, we cannot find that the trial court violated John's First Amendment rights. Therefore, his second assignment of error is overruled.

*Conclusion*

{¶48} For the foregoing reasons John's assignments of error are overruled and the judgment of the Shelby County Common Pleas is affirmed.

***Judgment Affirmed***

**WILLAMOWSKI, P.J. and ZIMMERMAN, J., concur.**

**/jlr**